CITY OF ABILENE, Appellant,

v.

BURK ROYALTY COMPANY, Appellee.

No. 4388.

Court of Civil Appeals of Texas, Eastland.

Oct. 23, 1970.

Rehearing Denied Dec. 4, 1970.

---

Ben Niedecken, Jr., City Atty., Abilene, Don Butler, City Atty., Austin, for appellant.

Frank L. Jennings, Jennings, Montgomery & Dies, Graham, for appellee.

GRISSOM, Chief Justice.

Burk Royalty Company sued the City of Abilene for damages caused by the taking or the permanent damage of its interest in a waterflood unit on or about August 7, 1968. Burk relied upon the provision in Article 1, Section 17, of the Constitution of Texas, Vernon's Ann.St. that: "No person's property shall be taken, damaged or destroyed for or applied to public use without adequate compensation * * *." Burk alleged the taking or permanent damaging of its interest was caused by extension of the City's airport runways, making it impractical to waterflood the unit and forcing them to abandon the project. By cross action the City sought to condemn an easement, provided that it should be determined that the City had taken or damaged any interest of Burk in the unit, and it sought judgment divesting Burk of all rights to use the surface for any purpose and of all right of ingress or egress to the surface thereof for the purpose of developing, mining or drilling for oil, gas or any minerals, so that Burk should have no right to use the surface of the tract condemned for any purpose. The City's pleadings provided, however, that Burk should have the right to "temporarily" extend equipment necessary for operating its leasehold interest above a 50 to 1 glide slope, upon giving 48 hours notice to the Federal Aviation Agency and the City's airport manager, with certain restrictions on such right, provided that, at no time, should service rigs or equipment extend above a plane commencing at the northern boundary and sloping upward to the south over such premises at the rate of 1 foot vertically to 20 feet horizontally.

A jury found (1) that the value of Burk's interest in the waterflood unit immediately before August 7, 1968, "disregarding any effect, if any, which the expansion or proposed expansion of the airport may have had on said property", was $98,000.00; (2) that the value of Burk's interest therein immediately after August 7th "taking into consideration the easement being condemned by the City", was $10,000.00, thus finding that such damage to Burk's interest on August 7, 1968, amounted to $88,000.00.

The jury also found that (3) the Gilmore-Nelson well was shut down about August 7th, (4) in connection with the expansion of the City's airport, and (5) that the value of Burk's interest in the oil which would have been produced from said well from August 7, 1968, to the time of the trial "had the well not been shut down" was $1,008.00. It found (6) that the Manahan well was shut down about August 7, 1968, in connection with the expansion of the City's airport and (8) that Burk's interest in the oil which would have been produced from that well "had it not been shut down" from August 7, 1968, to the time of trial was $1,680.00. The jury also found that (9) the City did "not prohibit" the supply of electricity to said wells. We think said issues, other than 5 and 8, were not in dispute.

The court sustained Burk's motion to disregard the answer to issue 9 that the City had "not prohibited" the supply of electricity to said wells. Electricity was furnished to the unit by Taylor Electric Co-op. By agreement, on August 7th, 1968, electricity was disconnected by said company from the waterflood unit and a tank battery moved because at that time the City's work had advanced to the point that the tank battery and electric lines to the two named wells then interfered with the City's work on the runway extension. It was also undisputed that electricity was restored by said company to some points of the unit. There was no evidence that the City "prohibited" the Co-op from supplying electricity to the two named wells. Electricity was not restored there because it would have been impractical to do so in view of the expansion of the runway, making it impossible to operate said wells. The court rendered judgment for Burk against the City for the $88,000.00, the difference between the value of Burk's interest in the waterflood unit immediately before and immediately after August 7, 1968, plus interest. The court also rendered judgment for the value of Burk's interest in the oil which would have been produced from the Gilmore-Nelson well and the Manahan well from August 7, 1968, to the time of trial, aggregating $2,688.00, as found in answer to issues 5 and 8. The City has appealed.

■■■ Appellant's points in connection with the finding of $88,000.00 damage to Burk's interest are based, principally, on the contention that there was, as a matter of law, no appropriation of Burk's property upon which to base said issues and findings and that the court erred in failing to grant the City's motion for judgment that Burk take nothing; erred in failing to grant the City's motion for judgment non obstante veredicto and, in the alternative, that the court erred in failing to grant the City's motion that Burk have judgment for only $2,688.00, towit, the value of the oil that would have been produced from said two wells from August 7, 1968 to the date of

trial, had they not been shut down on August 7th.

We think the court properly held that, as a matter of law, there was a taking or a permanent damaging of Burk's interest in said realty about August 7, 1968, and that the evidence was sufficient to support the answers to the effect that Burk was thereby damaged $88,000.00. The record shows that most of the leases involved in the waterflood unit, which waterflood project was abandoned because of the expansion of the City's airport and runways, were acquired by Burk on November 1, 1964, and that a small additional interest was acquired on July 5, 1966. When Burk bought the leases they had reached their economic limit from primary production; they were acquired by Burk for the purpose of waterflooding the unit to produce the remaining oil. In 1965 Burk commenced work toward unitizing the leases for a waterflood project. A unitization agreement forming such waterflood unit was prepared August 1, 1966. It was circulated and became effective on July 1, 1967, but prior to that date water injection was commenced at one well. After injection of water to waterflood the unit commenced, in May, 1967, Burk learned that the City planned an airport expansion which would conflict with its waterflood program. Negotiations were unsuccessful and the City continued to and did take the necessary surface of the land in the waterflood unit for its airport expansion and built fences enclosing the same. The City executed a contract for construction of new airport facilities, including a north-south runway, which necessarily took a considerable portion of the surface of the waterflood unit and construction thereof was commenced by the City in July, 1968. The area acquired by the City for such expansion included a substantial portion of the waterflood unit. In August, 1968, a tank battery and electric supply lines on the waterflood unit then interfered with airport construction and the City then obtained permission from Burk to move them. There were 10 producing wells on the

waterflood unit. Five were within the fence erected by the City enclosing the airport and a 6th was just outside the fence. The producing wells were operated with electric power supplied by Taylor Electric Cooperative when the tank battery and electric supply lines were moved. To permit the city to continue its airport construction said electric company removed its transmission lines from the area. In rerouting its lines the electric company disconnected all lines on the airport portion of the waterflood unit, but it thereafter connected electricity to all wells except the two mentioned. Electricity was never restored to them and they remained shut down from August 7, 1968. It was evident from the beginning that said two wells could not be operated under the airspace restrictions to be imposed for operation of the airport. In addition to the permanent shutting down of said two wells on August 7, 1968, there were other disruptions of the waterflood program. Some tubing and casing belonging to Burk disappeared from the Nelson well. They were removed by the City which later returned a part of them. In October, 1968, a bulldozer engaged on the airport expansion project broke an oil pipeline on the waterflood unit, bending and tearing up a few joints of pipe. Soon thereafter another pipeline was broken by trucks used in airport expansion work. This oil pipeline was buried and the break was not discovered until after loss of considerable oil. It was undisputed that to service the wells on the waterflood unit it was necessary for Burk's employees to travel roads which crossed the waterflood unit; that, because of airport construction, some of these roads were damaged and some at times made impassable. Construction of the airport expansion work interfered with the essential use of fences and gates and it became necessary to shut down the wells. Burk planned for 6 of the 10 wells to be used for water injection, however, only 2 were ever converted to injection wells. The waterflood program was abandoned because it was made economically impractical to continue by reason of the airport expansion. It was evident when the City's airport expansion plans became known that Burk could not successfully continue the waterflood program. It is evident that no reasonably prudent operator would have continued with the waterflood plan knowing of the airspace restrictions and other hazards to be imposed upon Burk in order to carry out the City's plans for expansion of its airport facilities.

In 22 Tex.Jur.2d 191, Eminent Domain, Section 120, it is said that:

"—the word 'taken' includes any direct invasion of a property right. It implies an actual physicial invasion or appropriation of property and includes the appropriation of any interest in land by actual physical possession, with the intention of permanently depriving the owner of his property or of permanently encroaching on his right of property. In other words, a taking of property ·means some actual physical invasion of a right of property with the intention of appropriating the property."

In 22 Tex.Jur.2d 196, Eminent Domain, Section 122, it is stated that the word "damage"

"—includes every loss or diminution of that which belongs to one private individual, occasioned by the fault of another, whether the injury results directly to the property owned or merely constitutes interference with the right that the owner has to the legal ·and proper use of his property. It implies that property has been injuriously affected with appropriation."

█ It is also evident that there was an actual physical invasion of Burk's property by the City with the intention of permanently encroaching thereon and that such action constituted a taking or permanent damaging of appellee's property. Of course, the City intended for its airport, as expanded, to be permanent. It did not have the right to so interfere with appellee's waterflood program during construction of new

airport facilities without condemning it. Furthermore, it is evident that such action took place on or about August 7, 1968. Estimation of the diminution in value of property does not depend solely on the causes of damage actually operating at the time of the trial. Causes of damage that may reasonably be expected to operate in the future may be considered. The probable or contemplated increase of operation may be included in computing the damage. 22 Tex.Jur.2d 268, Eminent Domain, Section 166. Appropriate to the situation disclosed by this record is the statement of the Commission in Hidalgo County Water Improvement District No. 2 v. Holderbaum, Tex.Com.App., 11 S.W.2d 506, that:

" 'Damaging or destruction' on account of 'public' use, required to be compensated (section 17, art. 1, Constitution), includes injury resultant (a) of construction of works and (b) of subsequent maintenance and operation."

See also City of LaGrange v. Pieratt, 142 Tex. 23, 175 S.W.2d 243.

As shown, the first significant encroachment upon Burk's realty occurred when the tank battery was moved, electricity was disconnected from the unit, and the two mentioned producing wells were permanently shut down. This was done about August 7, 1968, because they were then interfering with the City's work on its expansion program. In Rayburn, Texas Law of Condemnation, Section 152, where consent was given, as it was by Burk for the removal of the power line and the shutting down of the two wells to facilitate said expansion, it is stated:

"—that the date of the consent is the date of taking, and the constitution-mandate of prior payment, having been waived by the giving of consent, the taking is at least lawful enough to fix the date of taking, and the time at which to receive evidence of the market value of the land or damages to the remaining land."

The facts and authorities justify the court's adoption of August 7, 1968, as the date for determination of the damage to Burk's interest in the waterflood unit. See also State v. Lasiter, Tex.Civ.App., 352 S.W.2d 915 (writ dis.) ; 22 Tex.Jur.2d, Eminent Domain, Section 182. We conclude that the court properly held there was a taking or a permanent damaging of Burk's property rights by the City on or about August 7, 1968, and that Burk was entitled to have its damages assessed as of that date.

■ We overrule points to the effect that allegations and findings of negligence and proximate cause were essential elements of Burk's cause of action.

■ We have no power to pass upon appellant's points complaining of recovery for loss of oil which could have been produced from said two named wells after August 7, 1968, because such now asserted errors were not presented in its motion for a new trial and they do not constitute fundamental error. Texas Rules of Civil Procedure 324; 374; St. Louis Southwestern Ry. Co. v. Gregory (Tex.Sup.), 387 S.W.2d 27; Hortenstine v. McKlemurry, Tex.Civ. App., 402 S.W.2d 946; Texas Company v. State, 154 Tex. 494, 281 S.W.2d 83; Wagner v. Warnasch, 156 Tex. 335, 295 S.W.2d 890; Wagner v. Foster, 161 Tex. 333, 341 S.W.2d 887. Since repeal of the statute giving Courts of Civil Appeals authority to reverse for fundamental error there has been no express grant of that power. Our Supreme Court, however, has held that we do have such authority under greatly limited circumstances, such as lack of jurisdiction, where the error "directly and adversely affect the interest of the public generally, as that interest is declared in the statutes or Constitution" and where the parties have no justiciable interest. It is evident that none of said exceptions is applicable here. Ramsey v. Dunlop, 146 Tex. 196, 205 S.W. 2d 979; McCauley v. Consolidated Underwriters, 157 Tex. 475, 304 S.W.2d 265, 266; State v. Sunland Supply Company, Tex.

Sup., 404 S.W.2d 316; Newman v. King (Tex.Sup.), 433 S.W.2d 420.

We have carefully considered all of appellant's points. They are overruled. The judgment is affirmed.