**CITY OF ABILENE, Petitioner,**

v.

**BURK ROYALTY COMPANY, Respondent.**

**No. B–2507.**

Supreme Court of Texas.

July 28, 1971.

Whitten & Butler, Don R. Butler and Ben Niedecken, Jr., Abilene, for petitioner.

Jennings, Montgomery & Dies, Frank Jennings, Graham, for respondent.

STEAKLEY, Justice.

Burk Royalty Company brought this inverse condemnation proceeding against the City of Abilene. It alleged a taking or permanent damaging by the City of Burk's interests in the Chapman Waterflood Unit in connection with improvements in the airport runway facilities of the City. The City filed a condemnation cross-action for a clearance easement required for actual airport operations, conditioned upon a determination that there had been a taking or damaging of Burk's property during the period the new runways were under construction. Trial was to a jury whose findings will be noticed later. Judgment was for Burk in the sum of $88,000, with six per cent interest from August 7, 1968, together with $2,688 representing loss of production from two wells, and the City was awarded the clearance easement conditionally sought. The court of civil appeals affirmed. 460 S.W.2d 220. The City is petitioner here.

Burk acquired the oil and gas leases comprising the waterflood unit from C. E. Chapman and others on November 1, 1964 for the purpose of conducting secondary recovery operations by means of water flooding. Additional small interests were acquired thereafter. A unit agreement dated August 1, 1966 forming the Chapman

Waterflood Unit went into effect July 1, 1967 upon approval by a sufficient number of the interested parties. Water injections were commenced in one well in February, 1967. In May, 1967, the City notified Burk of its plans to expand its airport facilities in a manner which would involve the waterflood unit and on June 27, 1968, contracted for construction of the new facilities. Actual construction commenced in July, 1968.

There were ten producing wells and three injection wells in the Chapman Waterflood Unit, five of which were affected by the construction activities. In the course of construction it became necessary to relocate a tank battery and the transmission lines of the Taylor Electric Cooperative, Inc. which furnished electrical power to these wells. The tank battery was relocated at the expense of the City and with the permission of Burk. Arrangements were made by the City with the Taylor Electric Cooperative, Inc. for a relocation of the transmission lines outside the new runway and clearance area. To accomplish this purpose, the lines were disconnected to all of the wells in the airport portion of the waterflood unit on August 7, 1968, and thereafter, electrical service was restored to all of the wells with the exception of two identified as the Gilmore No. 1 and the Manahan No. A–2. These two wells remained disconnected, the reason for which is unclear. It was not shown either that Burk requested the Taylor Electric Cooperative, Inc. to reconnect the wells or that the latter refused to do so. There is some indication of a controversy between Burk and the City with reference to the expense which would have been incurred incident to a later reconnection of the wells.

There were other disruptions to Burk's operations. On one occasion Burk reported the loss of pipe which was discovered to have been moved by employees of the City. The pipe was returned to a convenient location for Burk. On other occasions construction machinery engaged in the airport project broke two oil flow lines resulting in a loss of oil. Some difficulties were also experienced by employees of Burk in reaching the pumps at some of the wells. This appears to have been caused by damage to the roads incident to the construction project and by the erection of fences and the inconvenient location of gates.

The judgment of the trial court recited the findings of the jury as follows:

SPECIAL ISSUE NO. 1: That the fair market value of Burk Royalty Co.'s interest in the Chapman Waterflood Unit immediately before August 7, 1968, disregarding any affect (sic) which the expansion or proposed expansion of the airport may have had on said property, was $98,000.00.

SPECIAL ISSUE NO. 2: That the fair market value of Burk Royalty Co.'s interest in the Chapman Waterflood Unit immediately after August 7, 1968, taking into consideration the easement being condemned by the City of Abilene in its cross-action, was $10,000.00.

SPECIAL ISSUE NO. 3: That the Gilmore-Nelson No. 1 well was shut down on or about August 7, 1968.

SPECIAL ISSUE NO. 4: That said well was shut down in connection with the expansion of the City of Abilene's airport.

SPECIAL ISSUE NO. 5: That the value of Burk Royalty Co.'s interest in the oil which would have been produced from said well from August 7, 1968, to the time of trial, had the well not been shut down, was $1,008.00.

SPECIAL ISSUE NO. 6: That the Manahan A–2 well was shut down on or about August 7, 1968.

SPECIAL ISSUE NO. 7: That said well was shut down in connection with the expansion of the City of Abilene's airport.

SPECIAL ISSUE NO. 8: That the value of Burk Royalty Co.'s interest in

the oil which would have been produced from said well from August 7, 1968, to the time of trial, had the well not been shut down, was $1,680.00.

SPECIAL ISSUE NO. 9: That the City of Abilene did not prohibit the supply of elecricity to the Gilmore-Nelson No. 1 well and the Manahan A-2 well.

The City objected to the submission of Special Issues No. 1 and 2 for the reason, among others, of the omission of any issue inquiring if there had been a taking, damaging or destroying of Burk's property; also, for the reason that the issues inquired of a time in August, 1968, which was not the date of trial. Thereafter, the City moved for judgment non obstante veredicto, and to dismiss its cross-action in eminent domain. The basic premise of these motions, and of the City's points of error here, was the absence of a finding or a showing that there had been an appropriation or taking of Burk's property in August, 1968, particularly in view of the jury finding that the City did not prohibit the supply of electricity to the two wells which remained disconnected. However, the trial court granted Burk's motion to disregard the answer of the jury to Special Issue No. 9 and to enter judgment in accordance with the other findings of the jury.

■ The essence of an inverse condemnation proceeding is that property has been taken and the property owner is attempting to recover compensation therefor. See Brazos River Authority v. City of Graham, 163 Tex. 167, 354 S.W.2d 99, 104 (1961). Burk is here attempting to recover pre-condemnation damages upon the theory that regardless of whether the activities of the City during the construction period amounted to a permanent taking, damages are nevertheless recoverable because they were on account of the public improvement, the operation of which would

ultimately require a permanent taking. Burk alleged, in fact, that the invasion of its property rights during the construction period "was intended to be permanent." And crucial Issue No. 2 required the jury to consider the "easement being condemned by the City of Abilene in its cross-action" in assessing the fair market value of Burk's interest in the unit after August 7, 1968, the date of disconnection of the two wells. The intermediate court, and perhaps the trial court,[1] was of the view that there was a permanent taking or damaging on August 7, 1968 upon the theory that " * * * it was evident from the beginning that said two wells could not be operated under the airspace restrictions to be imposed for operation of the airport." It seems apparent that the holding that a constitutional taking or damaging had been shown did not rest upon the claimed trespasses during the construction period, or upon a taking at such time, but upon the conclusion that the airspace restrictions and other hazards to be later imposed would render the waterflood program economically impractical and supportive of a taking at a later date.

■ We agree with this implied recognition that the construction activities of the City did not constitute a constitutional taking or damaging and, in fact, were no more than tortious acts which were sporadic and transient in nature. This is manifestly so with respect to the breaking of the two pipe lines, the moving of the tank battery and the interference with access to the wells. See Archenhold Automobile Supply Co. v. City of Waco, 396 S.W.2d 111 (Tex. Sup.1965); Brazos River Authority v. City of Graham, 163 Tex. 167, 354 S.W.2d 99 (1961); L–M–S Inc. v. Blackwell, 149 Tex. 348, 233 S.W.2d 286 (1950); Texas Highway Department v. Weber, 147 Tex. 628, 219 S.W.2d 70 (1949); Bexar Metropolitan Water District v. Kuntscher, 274 S.W.2d 121 (Tex.Civ.App.—San Antonio 1954, no

---

1. Or, it may be concluded that in view of the nature of the special issues submitted to the jury, the trial court impliedly found as a matter of law a completed taking or damaging on August 7, 1968, when the two wells were disconnected.

writ). It is likewise true of the disconnection of the two wells. The jury found that the City did not prohibit the supplying of electricity to the two wells and there is evidence to support this finding. Nor is there any evidence that the disconnection of the two wells permanently damaged the reservoirs or impaired the waterflood unit either immediately or potentially. The witnesses for Burk spoke in generalities and were unable to identify specific or actual injury to the waterflood unit. See Tennessee Gas Transmission Co. v. Nilson, 151 Tex. 446, 251 S.W.2d 503 (1952); Bain v. City of Temple, 428 S.W.2d 823 (Tex.Civ.App.—Austin 1968, writ ref'd n. r. e.). In fact, the vice president of Burk testified that the company lost interest in the project in May, 1967, when informed of the planned airport expansion and did not proceed further. This change in plans was not compelled by the activities of the City during the construction period and for aught that appears the waterflood unit could have proceeded apace during this time. The most that can be said is that utilization of the runway under the restrictions to be later imposed by the required flight easement would at that time lessen the feasibility of the project and impede its development. This future prospect was not a present taking. See Houston v. Biggers, 380 S.W.2d 700 (Tex.Civ.App.—Houston, 1964, writ ref'd n. r. e.); 11 McQuillin, Municipal Corporations, § 32.31 (3d ed. rev., 1964).

 Furthermore, since there was no prior taking, the cross-action of the City to condemn the flight easement, conditioned as it was upon a determination that there had been a prior taking or damaging of Burk's property, was not activated. Notwithstanding, Special Issues No. 1 and No. 2 inquired as to the value of Burk's property with and without being burdened with the easement sought in the cross-action but as of a time prior to trial when, as we have held, there had not been a taking or damaging. The anomaly in the resulting findings of the jury and the judgment of the

trial court is obvious. There has been an award of damages on the basis of a taking no sooner than at trial but assessed in the light of conditions at an earlier time when there had not been a taking. The general rule is that the market value of property which is condemned is determined as of the date of the taking of the property. See Barshop v. City of Houston, 442 S.W.2d 682 (Tex.Sup.1969) and San Antonio & A. P. Ry. Co. v. Ruby, 80 Tex. 172, 15 S.W. 1040 (1891).

It is thus apparent that the requisite elements of an inverse condemnation proceeding, i. e., a constitutional taking or damaging of property entitling the owner to compensation measured by conditions at such time, have not been shown. Since this was the whole theory of Burk's recovery, the judgments below must be reversed. However, we will exercise our discretion and remand the cause in the interest of justice. Rule 505, Texas Rules of Civil Procedure.

It is so ordered.