**Albert P. GORELICK, et ux.**

v.

**The STATE OF TEXAS, et al.**

**Civ. A. No. M–80–130–CA.**

United States District Court,
E.D. Texas,
Marshall Division.

Feb. 23, 1983.

---

C.W. Pearcy, Austin, Tex., for plaintiffs.

Larry Black, Michael E. Stork, Asst. Attys. Gen., Austin, Tex., for defendants.

## MEMORANDUM OPINION AND FINAL JUDGMENT

JOE J. FISHER, District Judge.

The plaintiffs sued the State of Texas and several of its employees, alleging violations of their property and civil rights. The litigation arose out of drainage problems on property in Harrison County, Texas, adjacent to U.S. 59, about five miles south of Interstate 20 and the town of Marshall.

Albert and Florence Gorelick complained that the State, acting through the Texas Department of Highways and Public Transportation ("the Highway Dept.") and its employees [1] violated their rights under the Fifth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 17 of the Texas Constitution. The Gorelicks claim that the defendants deprived them of the use of their property without paying just compensation.

Mr. Gorelick also complained of an illegal arrest under 42 U.S.C. 1983. He alleged that three county officials and the above defendants infringed his civil rights.[2]

The defendants moved to dismiss for lack of jurisdiction and failure to state a claim upon which relief could be given. The court entered a memorandum opinion on March 19, 1982 ruling on those motions. The court retained jurisdiction over the State and the Highway Dept.,[3] but dismissed the claim against the State employees.[4] Moreover, the civil rights complaint was dismissed, so that the only issue re-

---

1. L.L. Jester and Raymond Hudson, and Lemuel S. Guest were engineers and staff attorney, respectively, for District 19 of the Highway Dept., Atlanta, Texas. They were sued in their individual and official capacities.

2. Gorelick alleges that county prosecutor Sam Baxter, sheriff N.F. Shivers, and deputy sheriff J.C. Norman participated in his arrest and removal from his property in August, 1978.

   Gorelick had dammed the end of a channel easement on the corner of his property. When the Highway Dept. personnel came to clean out their easement, Gorelick blocked their way with his tractor. He was forcibly removed, handcuffed, and kept in custody for about four hours. The officers told Gorelick he was not under arrest. No prosecution followed his release. During Gorelick's detention, Highway Dept. personnel cleared the channel easement so water could again flow from the highway right of way across Gorelick's land.

3. In ruling on those motions, the court rejected the State's claim to immunity from suit in federal court based on the Eleventh Amendment of the U.S. Constitution because Texas had consented to suit in House Concurrent Resolu-

tion No. 148, signed June 24, 1980. The resolution "granted [plaintiffs] permission to sue the State of Texas and the State Highway and Public Transportation Commission for any relief to which they may be entitled as a result of [their claim for flood damage]."

4. The court found that the State's employees were rightfully on the easement when Gorelick blocked their way. As owner, the Highway Dept. was entitled to reasonably maintain its easement and could enter without a court order—notwithstanding pending litigation pertaining thereto. Gorelick unlawfully interfered with their entry on the property.

   The Highway Dept. employees properly requested his removal, and the peace officers involved acted in good faith in removing him. The court concluded that the Highway Dept. employees were merely nominal parties, sued for acts done entirely in their official capacities. The court held the county prosecutor immune under *Tumbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1974). The sheriff and deputy were held entitled to qualified immunity, as were the Highway Dept. employees. *See Reimer v. Short,* 578 F.2d 621 (5th Cir. 1978).

maining to be tried was the unjust taking claim.[5]

## I. THE FACTS

In 1969 the Highway Dept. began acquiring additional right of way in order to widen two lane U.S. 59 into a four lane, divided highway. In addition to the right of way, the Highway Dept. bought from two of Gorelick's predecessors in titles a channel easement extending into the property some eighty five feet from the right of way.[6]

In addition to a 36 inch culvert that carries water to the channel easement, a pair of 42 inch culverts located about 550 feet north of the 36 inch culvert feed another stream bed that also crosses the property. These culverts carry all of the run-off water from a ± 94 acre watershed east of U.S. 59. The water flows into the creekbeds, beginning over a quarter mile east of the highway and continuing west across the property until intersecting Collier Creek.[7]

Approximately 12 acres west of the highway drain south into the bar ditch along the right of way and eventually flow into the stream bed that intersects the twin 42 inch culverts.

Having acquired the right of way and easement, the Highway Dept. began construction. Improvements to the highway in front of the property were complete by September 8, 1972. That phase of construction extended from well south of the property to a point ± 1300 feet north of its northeast corner. Work on the phase to the north, extending up to Interstate 20 and Marshall, began in October, 1972 and ended August 6, 1976.

The Highway Dept. bought right of way and part of the easement from Roger Long. He had owned the property since 1965. Long sold the property to Vanis Goolsby in June, 1972. In September of the following year, Goolsby sold the property to the Gorelicks.

They occupied the house in November, 1973, and later acquired additional acreage adjacent to the original 27 acre tract. At

---

**5.** The court determined that, based on the pleadings and briefs filed, Gorelick failed to state a cause of action under the Civil Rights statute, 42 U.S.C. § 1983. It appeared to the court that Gorelick had been treated inconsiderately and high-handedly by the Highway Dept. employees. The court believes the State should have acted with far more diplomacy. Inasmuch as they obviously expected some trouble with Gorelick, the Highway Dept. employees could have easily obtained a court order mandating the clearing of the channel easement. Having made these observations however, the court could discern no violation of Gorelick's constitutional rights in the August, 1978 confrontation.

Gorelick's claim that there had been a taking of his land by the State without compensation survived the motion to dismiss. Since a violation of the Fourteenth Amendment was alleged, *see e.g., Griggs v. Allegheny County*, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), federal question jurisdiction was properly invoked. 28 U.S.C. § 1331 (1976).

**6.** The existing highway was hazardously hilly just south of Marshall where it intersected Collier Creek and F.M. 2625. Besides widening the roadway, the Highway Dept. planned to alter the grade of the highway by "flattening out" the hills.

The roadway in front of the Gorelick property was to be lowered by about three feet and the drainage culvert thereunder, by about five feet. In order to carry the water from the lowered culvert into the existing drainage swale that received water from the old culvert—albeit from a higher elevation—a channel easement extending into the property was required.

The recorded easement was "for the purpose of opening, constructing and maintaining a permanent drainage channel in, along, upon and across the ... property with the right and privilege at all times of having ingress and egress in, along, upon and across such property for the purpose of making additions to, improvements on, and repairs to the said drainage channel or any part thereof ..."

The effect of the easement was to allow the State to dig a ditch so as to lower the existing stream bed which carried water from far east of the highway across the property and into Collier Creek, and allow it to intersect the existing flow line at a lower elevation.

**7.** Collier Creek, where it leaves the property, carries the run-off water from a ± 2200 acre watershed which originates about three miles northwest of the property. A rainfall of an inch or more will ordinarily swell the creek where it crosses the property, and often make it rise above its four to five foot banks.

the time suit was filed, Gorelick owned about 63 acres bisected on a northwest to southeast diagonal by Collier Creek, and fronting on the west side of U.S. 59 and the north side of F.M. 2625.

When a heavy rainfall occurs, part of the property is temporarily covered with run-off water flowing to Collier Creek. Even absent a recent rain however, the lower acreage abounds with small springs that continuously seep water. The property is best described as "deep bottom land," suit-able for pasture only part of the year. Ac-cording to prior owner Long, when he bought it, the acreage downhill from the house site was "just swampy bottom land."

Gorelick was not a native of east Texas when he came to Marshall in 1973. He saw the property only once before he bought the land. Moreover, he did not walk the land prior to occupying the property. He was therefore ignorant of the condition of the land. Gorelick did not perceive the channel easement excavation when he bought the property because it was all grown up with vegetation then.

Shortly after the Gorelicks moved into the house, a heavy rain drenched the vicini-ty and, to their dismay, much of their newly acquired homestead was covered with water.

## II. HISTORY OF THE LITIGATION

The gravamen of the Gorelick complaint is that the Highway Dept. altered the drainage course upstream from the proper-ty and caused their land to flood so severely as to constitute a "taking" in violation of the Fourteenth Amendment to the U.S. Constitution and of Article 1, Section 17 of the Texas Constitution.[8]

8. The Texas Constitution provides that "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person; ... *Id.*, Art. 1, § 17.

9. Because Gorelick did not appear to be able to convey clear title to an easement on the north-ern tract, the Highway Dept. later withdrew this proposal.

Gorelick contacted the Highway Dept. local office and was referred by a Mr. Cox to the resident engineer, Tom Rideout. Re-portedly, Rideout told Gorelick that the property had "always flooded when it rained." He advised Gorelick to contact the district engineer in Atlanta, Texas.

Gorelick wrote to the Atlanta office, and contacted his State Representative, as well. Following a telephone call by the Repre-sentative to the Highway Dept., and Gorel-ick's letters to the Highway Dept. in Aus-tin, a meeting was arranged in May, 1974.

Eventually, Highway Dept. engineers Hudson and Rideout met Gorelick on the property and discussed the drainage condi-tions. The engineers offered to realign the stream bed, between the culvert and the stream bed to the west, to the north and off of his property. That would have meant abandoning the channel easement and ac-quiring a new one north of the first.[9]

After reflecting on the proposal, Gorelick declined, reasoning that relocating the channel easement northward would simply redirect the water flow across his land without in any way reducing the volume of water that entered. He then demanded that the Highway Dept. reroute all of the water from the culverts and bar ditch. He demanded that the water be carried south-ward along the right of way until it could enter Collier Creek downstream from his property. The Highway Dept. rejected Go-relick's proposal.[10] No further discussions were held about resolving the problem. Go-relick did, however, write the District Engi-neer advising that he "would stop the water from entering [his land] and do whatever it took. Any time the Highway Dept. tried to

10. While the water could, perhaps, have been carried south to the creek without enormous expense when the roadwork was being done, by the time Gorelick bought the property, the highway grading and structures had been com-pleted for almost three years. A change in the drainage at that late date would have cost more than the property itself. Moreover, the diver-sion of surface water proposed by Gorelick might have damaged property downstream from his property.

clean the easement, [Gorelick] would consider it trespass." So matters stood until the day of Gorelick's arrest.[11]

In 1974 Gorelick filed suit in State court alleging inverse condemnation in violation of Article 1, Section 17 of the Texas Constitution [12] and the Fourteenth Amendment to the U.S. Constitution.

In 1975 Gorelick resorted to self-help and placed fill dirt along his property line near the culverts. Gorelick styled his earthen berm a "road," but it acted as a dike—preventing the culvert water from entering the ditch in the channel easement. The impounded water in the right of way threatened the integrity of the roadbed, the Highway Dept. claimed.

The Highway Dept. filed a counter claim in 1977 in the suit still pending in State court. It sought thereby to enjoin Gorelick from blocking the natural flow of water through and downhill from its channel easement.

By August, 1978, the State court had not yet heard the suit. The Highway Dept. then resorted to self-help. On August 28 it sent men and equipment to clear the channel easement. Perhaps in anticipation of a confrontation, a Highway Dept. official asked the Sheriff to send a man along. As expected, Gorelick resisted their entry to his land. He was forcibly removed and detained for the duration of their excavations.[13]

The unfortunate incident of August 28 so irritated Gorelick that he filed an additional complaint against the State because of his arrest that day.

When the case was heard in State court in April, 1980, the only issue tried was the State's counter claim for an injunction.[14] The Highway Dept. prevailed at trial and obtained an injunction prohibiting Gorelick

from blocking "the natural flow of water through and below the State's easement."

Gorelick filed this suit in July, 1980. The case was tried before the court without a jury on March 20, 1982. On its own motion, the court called a hearing on January 28, 1983 at which the parties reviewed the evidence submitted at trial and presented additional evidence on the question of damages.

The court has reviewed the evidence, the transcript of record, the briefs and argument of the parties. For the reasons explained below, the court finds for the defendants and against the plaintiffs.

## III. ANALYSIS

It is undisputed that a one inch rainfall results in some "flooding" of the Gorelick property. Moreover, most of the water appears to reach the property via the underhighway culverts in front of it. The Highway Dept. concedes that 94 acres east of U.S. 59 drain into the two sets of culverts. The mere fact of the flooding is not, however, sufficient to make the Highway Dept. liable to Gorelick.

█ Under Texas law, an adjacent land owner, damaged by the overflow of surface water diverted by road construction, has a cause of action against the county. Tex. Rev.Civ.Stat.Ann. art. 6730 (Vernon 1960). The roadbuilding agency is required to drain water with "due regard for the natural water flow, and with as little injury as possible to the adjacent land owner." *Id.* This statute appears to effectively impose strict liability upon the county for damages without regard to negligence. *See Harris County v. Gerhart,* 115 Tex. 449, 283 S.W. 139 (1926).

█ In the absence of authority to the contrary, the court understands damages for injurious overflow to be measured as in

---

11. See note 2 above.

12. See note 8 above.

13. See notes 2 & 4 above.

14. The defendants had previously moved to sever the civil rights claim from the inverse condemnation and injunctive relief claims.

The State district judge granted the motion when he called the case for trial. Gorelick then sought a continuance. When the judge denied the motion for continuance, Gorelick took a non-suit without prejudice on his inverse condemnation and civil rights claims.

disputes under the Texas Water Code.[15] If the injury is temporary, damages are measured by the cost of restoring the property to its condition immediately before the injury, plus the reasonable value of the loss of its use. If permanent, the damages are measured by the difference between the reasonable cash market value of the property immediately before and immediately after the injury. *See e.g., Weaver Construction Co. v. Rapier,* 448 S.W.2d 702 (Tex.Civ. App.1969—no writ); *Coleman v. Wright,* 155 S.W.2d 382 (Tex.Civ.App.1953—no writ).[16]

■ Moreover, the cause of action for surface water damage lies in favor of the owner of the injured property at the time the injury first occurred, and not in favor of a later buyer of injured property. *City of Dallas v. Winans,* 262 S.W.2d 256 (Tex. Civ.App.1953—no writ).[17]

Gorelick claims to be the victim of a taking without due process and compensation. He maintains that, by causing such large quantities of water to repeatedly cross his land, the Highway Dept. has, in effect, condemned his property and taken it for State use. Accordingly, he styles his suit an "inverse condemnation" action.

Gorelick urges the court to find that the repeated inundation of his land is sufficiently permanent to constitute a taking. *See e.g., Brazos River Authority v. City Of Graham,* 163 Tex. 167, 354 S.W.2d 99 (1961).

■ If a constitutional taking has occurred, the court believes that Gorelick's damages would be measured as noted above. The general rule in inverse condemnation cases is this: "that the market value of property which is condemned is determined as of the date of the taking." *City of Abilene v. Burk Royalty Co.,* 470 S.W.2d 643, 647 (Tex.1971).

The preceding discussion makes manifest the need to determine *when* the land was first (and worst) injured by water. That finding will determine: (1) whether a taking has occurred by virtue of the road widening; (2) the owner of the cause of action, if any; and (3) the valuation of the property if damages are recoverable.

The court believes that if the worst flooding preceded the widening of the highway, no later inundation can fairly be attributed to the roadway improvements, and no taking has occurred. If the worst inundation of the land happened before Gorelick's purchase, any cause of action would belong to his predecessor in title. Finally, if the worst flooding followed his purchase, Gorelick's damages must be calculated as of that day.

The court further reasons that it must find *why* the flooding occurred. If the water runs in the natural drainage course, and would inundate the property regardless of the existence of the highway or its improvements, the latter cannot have caused a taking. Likewise, if the flooding followed

---

**15.** Texas law generally prohibits any diversion or impounding of the natural flow of surface water in such a way that the overflow damages the property of another. Tex. Water Code Ann. § 5.086(a) (Vernon 1972). The injurious diversion of water by agencies of the State is not, however, governed by this statute. *Messer v. City Of Refugio,* 435 S.W.2d 220 (Tex. Civ.App.1968—writ ref'd. n.r.e.)

**16.** This measure of permanent damages is appropriate, the court believes, even though the injurious invasion of water may be repetitive, as it is here. The land's utility—and thus, its value—was reduced when first flooded. Later inundations not more extensive than the original do not further diminish the land's value. They simply keep the utility of the land at its previously diminished level. Of course, a later

flooding that exceeds the original one would, to the extent it damages additional land, constitute a new injury.

**17.** Following the reasoning above and in note 16, the person who buys property already damaged by water would be able to recover for later damage only to the extent it goes *beyond* the previous injury. This is so because the diminution in the utility and value of the property was suffered by the previous owner. The later buyer of the injured property paid a price that is presumed, as here, to reflect the land's diminished utility. Allowing the later buyer to recover for his vendor's loss gives him the benefit of: the land, money for the diminution of its value that preceded his purchase, and a purchase price reduced by the amount of the injury. He would reap a windfall.

an unusually heavy rain, such as would have caused flooding in any event, no taking has occurred.

It is the opinion of the court that Gorelick can recover only if several conditions are found to exist simultaneously: (1) a flooding worse than any previous one; (2) that happened after his purchase; (3) that was due to a seasonable rainfall; and (4) that would not have occurred but for the modifications of the highway.

Unfortunately, no actual records of flooding were presented at trial. Instead, the court heard recollections of several residents of the Collier Creek area. They spoke about past flooding and drainage conditions in the vicinity of the property. A summary of the pertinent testimony follows.

Freddie L. Woolin, a 59 year resident of the area and one-time owner of part of Gorelick's property, recalled that when the creek filled up, it flooded the surrounding area.

Henry Poss, a deceased Highway Dept. maintenance supervisor responsible for cleaning the drainage ditches along the highway in front of the property, testified by deposition. He recalled that, even before the widening of U.S. 59, water would sometimes overrun the bar ditches and flow across the property. Poss did not know if more water comes through the culverts following the roadwork.

Albert Gorelick said that 0.2 inches of rain causes flooding of his land. He termed the flooding "continuous" since 1975. Gorelick presented a videotape to show the severity of the water flow. He testified however, that the water flow in November, 1973 was worse than shown in the 1981 videotape. Gorelick's testimony indicated that the water flow is about the same intensity now as in 1973.

Harold McLendon, who for 34 years lived five miles south of the property, testified that drainage ditches on old U.S. 59 carried water south to the creek at F.M. 2625. He recalled the hill in front of Gorelick's property being cut down by three or four feet.[18]

Laurence Jester was the Highway Dept. District Engineer in Harrison County. He said that the flow of water onto Gorelick's property had not materially changed due to the road work. Jester explained that water would occasionally "sheet across" old U.S. 59 because the original culvert was too small. That water entered the property and flowed in a "low swale" following the natural drainage course. It was there that the channel easement was later taken. With the exception of some minor changes within the right of way, water drains along the same routes as before the construction, he testified. Jester opined that the velocity of the run-off water might have decreased due to the flatter slopes on the road and right of way.

John W. Livingston appeared as the Highway Dept. expert in hydrology. He prepared a map of the Collier Creek watershed that included the Gorelick watershed within it. He had walked the land to verify the location of the creek beds, drainage channels, and ridge lines. Livingston had also inspected Gorelick's property on foot. He said the Highway Dept. had not altered the natural course of drainage outside the right of way, and had not diverted any additional water onto the property than would naturally have been there. Using the aerial photographs to illustrate, Living-

---

**18.** Each of the above witnesses testified to the existence of bar ditches on both sides of old U.S. 59 that drained south toward F.M. 2625. Their existence is undisputed. From that, the plaintiff concludes that previously all of the Gorelick watershed uphill from his property drained, via those bar ditches, south to Collier creek without entering his land. That conclusion is totally unwarranted. In fact, the opposite is true: none of the water from the Gorelick watershed entered Collier Creek directly from the bar ditches. The testimony and the topographic maps and sectional drawings describe a hill in front of the property. The ridge line of the Gorelick watershed runs along the crest of that hill. It was the planned lowering of that hill that necessitated the acquisition of the channel easement. Moreover, the existence of that hill—before and after the road work—prevented water from flowing directly to Collier Creek in the roadside bar ditches lying on the northern side of the hill's ridge line.

ston showed how there was a natural drainage flow across the property both before and after the road work was done. He said that the Gorelick watershed draining through the 36 inch culvert was reduced to 97% of its previous area, thereby putting less water onto the property than before.

Roger Long described the condition of the land before Gorelick purchased it. Long bought the property in 1965 and lived there until selling it in June, 1972. Gorelick bought the property from Long's vendee about 15 months later.

Long described the property as "deep bottom land," "marshy," and "swampy." He recalled that water frequently flowed from east of the highway and onto his land. Water flowed between his house and the property line "most near everytime it rained, a rain of any size." On numerous occasions, he said, the land between his house and Collier creek flooded—sometimes as much as five to six feet deep. Often water would spread completely across most of the land, and once, one of his cows was washed away by the rising water.

Long recalled the "swag," or swale, in the ground where water ran from the highway and intersected water flowing south from his neighbor's land. It flowed in those two "little branches" across the land and into Collier creek. He corroborated Gorelick's testimony that a one and one half inch rain in eight hours would flood the land.

The road work was virtually complete when Long sold the site. He perceived no change in the drainage across the property following the construction. In response to the court's question, Long said that he understood the significance of the channel easement when he sold it to the Highway Dept. He realized then that the water would flow through the channel easement just as it does now.

Ray Hester, a 65 year resident of the area, once lived on the property adjacent to the Gorelick homesite. He had seen water from the old culverts flow across the land

just as it now does from the new ones. Hester also recalled seeing the land behind the house flooded before. He thought it quite deep, "because there was lot of water coming down through there."

The court's review of the testimony and exhibits convinces it that the property has always been subject to flooding, simply because of the lay of the land. The Gorelick property is at the lowest point in a ± 2200 acre watershed. Even the highest part of his tract carries water from a ± 106 acre watershed via two readily discernible drainage channels, or creek beds. An examination of the topographic maps of the area reinforces the court's confidence in this finding: surface water, in harmful quantities, drains across the property in natural drainage courses. No evidence disputes this.

It is possible, of course, that the Highway Dept. could have aggravated an already bad drainage condition. Gorelick insists that this is so, yet he failed to present any evidence to that effect. Gorelick offered no evidence that the land flooded worse after his purchase, or even after the road work, than before. He failed, as well, to show how any changes in the highway beyond its increased paved area had caused more water flow.

Gorelick simply showed that the Highway Dept. had modified the highway—by widening it, changing culvert sizes, and regrading bar ditches—and concluded, without proof, that the changes caused harm to the land. That conclusion is unwarranted.

Much of the plaintiff's case concerned the changed culverts. One culvert was reduced in size from three feet by four feet to three feet in diameter. Livingston explained that this culvert now drained a smaller watershed than its predecessor had.[19] The culvert to the north was enlarged. The original three foot square box culvert was replaced by a pair of 42 inch diameter culverts. That the new culverts can carry more water than the original, as Gorelick

19. That was because additional water had been routed down the east right of way bar ditch directly to the creek where the road elevation opposite Gorelick's house had been lowered.

emphasized, does not show that any more water than before enters it.[20]

Testimony about the bar ditches along old U.S. 59 carrying water south to Collier Creek is not incorrect, but simply irrelevant. The testimony and exhibits show that these ditches never drained the Gorelick watershed, only land south of the watershed ridge line.

The only significant change in the highway was the doubling of its pavement area. Naturally, a paved surface does not absorb water nor slow its flow the same as natural terrain does. The Highway Dept. concedes that it added about 4.6 acres of asphaltic concrete area to the Collier Creek watershed above F.M. 2625, with about 1.24 acres of that within the Gorelick watershed.

How that additional pavement affects water run-off is not entirely clear. The initial run-off rate would be higher because the ground below the pavement is not absorbing any of the rain as it did when bare. Once enough rain has fallen to saturate the ground, however, the existence of the pavement does not change the volume of water draining in the watershed and onto adjacent or downhill land.

Moreover, the increased flow is arguably offset by the flatter incline or slope of the widened road. The only evidence presented was that no material change in water flow resulted from the combination of changes noted.

To illustrate the significance of the added pavement, the hydrologist Livingston noted other improvements that would have a comparable effect on water run-off. His calculations showed that the increased pavement in the Gorelick watershed would affect water run-off the same as if: a farmer cleared 4.9 acres of land; a developer built a 2.7 acre housing project; or a contractor built a 1.5 acre schoolyard.[21]

Assuming, *arguendo,* that the road work did cause more water to enter the property and to damage it, the court must consider when the improvements were made. The overwhelming weight of the evidence shows that the section of road in front of and extending 1300 feet north of the property was completed by September 8, 1972. This was over a year before the Goricks moved in. If the rainfall during that year was more or less normal, the effects, if any, of the improvements should have appeared during that year.

Gorelick emphasized the fact that the section of the highway beginning at the north end of the first phase was not completed until August 6, 1976. That fact is undisputed, but its significance is obscure.

Only ± 600 feet of the northern phase are within the Gorelick watershed and could possibly affect his property. The evidence indicated that the northern phase drainage structures were in place and embankment placement was underway by September, 1973 when Gorelick bought the property. No pavement had been placed before then, however.

It appears to the court that the Highway Dept. can conceivably be liable to Gorelick only for the increased run-off that resulted from adding two lanes of pavement some 600 feet in length. That added pavement covers less than half an acre. It is equivalent to a corner service station site, or a few tennis courts. The effect of that small increase in pavement in the Gorelick watershed, the court concludes, is only *de minimis.*

---

**20.** The drainage structure was enlarged because the new culvert was lowered relative to the roadbed. Previously, excess water would cross over the highway there. The enlarged culverts eliminate the problem of overflow water on the road. The effect on adjacent, lower land is, in either event, the same.

**21.** The court cannot conceive of holding a farmer liable to a downhill property owner because the farmer clears five acres of land for planting. Neither can it imagine requiring a county to pay for water damages because it builds a school and playground at a higher elevation in the watershed than the plaintiff. Nonetheless, as noted above, Texas law requires that counties pay for harm done to adjacent landowners by water due to road construction. Tex.Rev.Civ.Stat.Ann. art. 6730 (Vernon 1960).

## IV. CONCLUSION

The court has reviewed the evidence, the transcript, and the briefs filed by the parties. It is the opinion of the court that: since the time the Gorelicks purchased the property, there has been no increase in water run-off across it; the modifications to U.S. 59 did not result in the diversion of surface water from its natural drainage channels, and did not in any measurable degree increase the flow of surface water to the detriment of the Gorelick property; and the property floods because of natural conditions preexisting the construction of the highway. Because of these facts, the court concludes that the property is now in essentially the same condition and has the same utility as it did when the Gorelicks purchased it. There has been no taking by the Highway Dept. because it has neither altered nor increased the natural flow of water. Accordingly, it is

ORDERED, ADJUDGED and DECREED that the Plaintiffs, ALBERT and FLORENCE GORELICK do have and take nothing from the Defendants, STATE OF TEXAS, ET AL. Each party shall bear its own costs.