# IN THE SUPREME COURT OF TEXAS

════════════

No. 10-0491

════════════

HEARTS BLUFF GAME RANCH, INC., PETITIONER,

v.

THE STATE OF TEXAS AND
THE TEXAS WATER DEVELOPMENT BOARD, RESPONDENTS

══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

══════════════════════════════════════════════

**Argued October 5, 2011**

JUSTICE WAINWRIGHT delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE GUZMAN, and JUSTICE LEHRMANN joined.

JUSTICE HECHT filed a dissenting opinion, in which JUSTICE MEDINA and JUSTICE WILLETT joined.

The judiciary has a historic duty to uphold constitutional protections of individual liberties.[1]

But the individual must present a claim countenanced by law. It is not prudent to sanction a seventy

million dollar demand against the State of Texas for an alleged taking of a property interest when

1) as acknowledged by all parties, the United States Army Corps of Engineers, not the State of

Texas, exercised its exclusive authority to deny petitioner's application for a federal mitigation

banking permit on the land, and 2) the federal courts have held that petitioner has no cognizable

---

[1] This Court has endeavored to do so. *See, e.g., Severance v. Patterson*, __ S.W.3d __ (Tex. 2012); *Texas Rice Land Partners, Ltd., v. Denbury Green Pipeline-Texas, LLC*, 363 S.W.3d 192 (Tex. 2012); *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620 (Tex. 2004).

property right in the federal permit at issue.  Under these circumstances, petitioner failed to plead a viable takings claim.

* * *

The backstory for this case is the State's continuing battle to manage its critical water resources.  The Texas drought from 1950–1957[2] has been described by a Texas water official as "the most costly and one of the most devastating droughts in 600 years."[3]  The 1950s drought "reshaped Texas, ruining thousands of farmers and ranchers and pushing rural residents to migrate out of the country and into the cities."[4]  Comal Springs stopped flowing out of the Edwards Aquifer for the first and only time in recorded history.[5]  In 1952 the Cotton Bowl, the stadium at Fair Park in Dallas, drilled its own well within the stadium to water the field because the city could not furnish the water

---

[2] The award-winning historical novel, *The Time It Never Rained*, parochially describes the drought.

Just another dry spell, men said at first . . . Men grumbled, but you learned to live with the dry spells if you stayed in West Texas; there were more dry spells than wet ones.  No one expected another drouth like that of '33.  And the really big dries like 1918 came once in a lifetime.

Why worry?  They said.  It would rain this fall.  It always had.

But it didn't.  And many a boy would become a man before the land was green again.

ELMER KELTON, THE TIME IT NEVER RAINED 1–2 (Tom Doherty Assoc., LLC 2008) (1973); *see also* Petitioner's Reply to Response to Petition for Review, App'x 1, at Exhibit 2 (providing highlights of 2007 State of Texas Water Plan).

[3] Farzad Mashhood, *Current Drought Pales in Comparison with 1950s 'Drought of Record,'* AUSTIN AMERICAN–STATESMAN, Aug. 3, 2011, [hereinafter Mashhood, *Current Drought Pales in Comparison*] http://www.statesman.com/news/local/current-drought-pales-in-comparison-with-1950s-drought-1692176.html.    All electronic sources checked as of August 22, 2012 and available in the clerk of court's file.

[4] *Id.*

[5] Kathy Wythe, *The Time It Never Rained: How Texas Water Management has Changed Because of Recurring Droughts*, TEXAS WATER INSTITUTE, NORTH TEXAS e-NEWS, Dec. 27, 2011, [hereinafter Wythe, *The Time It Never Rained*] http://www.ntxe-news.com/cgi-bin/artman/exec/view.cgi?archive=45&num=73338.

it needed.[6]  By the end of the drought, 244 of Texas' 254 counties were classified as disaster areas,[7] and losses from the drought were estimated at $22 billion in 2011 dollars.[8]

The Legislature responded to the drought by creating in 1957 the Texas Water Development Board (TWDB), charged with forecasting water supply needs and developing a comprehensive state water plan for water management, conservation, and response to drought conditions.[9]  With policy-makers focused on the water needs of a thriving State, from 1957 to 1980 Texas constructed more than 126 major reservoirs[10] and from 1957 to 1970 built 69 dams, including Longhorn Dam on the Colorado River, which formed Lady Bird Lake in 1960.[11]  These efforts expanded the State's water storage, as the State concurrently sought new sources of groundwater in underground aquifers.[12]

Continuing to address Texas' water needs and usage after another drought in 1996, the Legislature passed Senate Bill 1, likely the most comprehensive water bill in the State's history, requiring the TWDB to publish a comprehensive state water plan every five years and base its projections on a fifty-year time horizon.[13]  As of August 2011, the recent drought had left three-quarters of the state in the exceptional drought category and over 99 percent of the state in some

---

[6] *Id.*

[7] *Id.*

[8]  Mashhood, *Current Drought Pales in Comparison*.

[9] TEX. WATER CODE §§ 6.011, 16.051(a), 16.051(g), 16.053; *see* TEX. CONST. art. III, § 49-c.

[10]  Wythe, *The Time It Never Rained*.

[11]  Mashhood, *Current Drought Pales in Comparison*.

[12] *Id.*

[13]  Act of June 1, 1997, 75th Leg., R.S., ch. 1010, 1997 Tex. Gen. Laws. 3610-83.

form of drought condition.[14]  Against this backdrop, the TWDB has identified potential reservoir sites going back decades and revised water plans as tasked by the Legislature.

Hearts Bluff Game Ranch, Inc. (Hearts Bluff) purchased some of the wetlands on one of the sites identified by the TWDB as a potential reservoir location.  When the United States Army Corps of Engineers (USACE or Corps) denied its application for a mitigation banking permit because the State had identified the site as a potential reservoir, Hearts Bluff sued the State and the USACE for a taking for interfering with its asserted right to commercially develop the land as a mitigation bank.

The question posed is whether a takings claim against the State may be predicated on the denial of a permit by the federal government when the State had no authority to grant or deny the permit.  Our answer is no, absent establishing bad faith, and we affirm the judgment of the court of appeals, reversing the trial court's denial of the plea to the jurisdiction.

## I.  Introduction and Background

In 2003 and 2004, Hearts Bluff purchased approximately 4,000 acres of "bottomland" in Titus County near the Sulphur River. "Bottomland" is seasonally or continuously flooded hardwood river swamps.  313 S.W.3d 479, 481.  Hearts Bluff planned to create a federal mitigation bank which is a commercial endeavor that allows a person who restores, establishes or preserves a wetland or other aquatic resource to sell "mitigation bank credits" he receives from the federal government to third parties who negatively impact aquatic resources in other locations.  *See* 33 U.S.C. § 1251; 33 C.F.R. §§ 332.2, 332.3(b)(2) (2011); *Butler v. Comm'r,* 103 T.C.M. (CCH) 1359, at *38, n. 20 (2012) (citing the U.S. Environmental Protection Agency, Mitigation Banking Factsheet, available at http://www.epa.gov/owow/wetlands/facts/fact16.html. 33 C.F.R. 332.1, 332.3(b)(2) (2011).  The

---

[14] Mashhood, *Current Drought Pales in Comparison.*

Corps is the only governmental entity with authority to issue these permits. Clean Water Act, 33 U.S.C. § 1344 et seq. (authorizing the Secretary of the Army, acting through the "Chief of Engineers," to issue these permits); Rivers and Harbors Act of 1899, 33 U.S.C. § 403 (similar); 33 C.F.R. §§ 332.1, 332.3 (describing general compensatory mitigation requirements); *see also* Clean Water Act, Pub. L. No. 108-136, § 314(b), 117 Sta. 1431 (2003). Hearts Bluff acknowledges the exclusive authority of the Corps to grant or deny federal mitigation banking permits.

Hearts Bluff's land lies within the bounds of the potential Marvin Nichols Reservoir, a 67,957 acre site identified by the State since 1968 as a possible drinking water reservoir to service the Dallas and Fort Worth areas. Marvin Nichols Reservoir has been included in every version of the TWDB's state water plan[15] since 1968.[16] Hearts Bluff acknowledged that at the time it purchased the land, it was aware both that the State was considering creating the reservoir and that the land it purchased was within the reservoir's footprint.

After Hearts Bluff purchased the land and applied for a mitigation banking permit with the Corps, the Corps solicited public comment on Hearts Bluff's application. The USACE solicited comments from resource agencies, other federal, state and local government agencies, public interest groups, the general public, adjacent property owners, and other interested parties on various factors. The Corps received over 300 responsive comments, including from state elected officials representing Northeast Texas, the Texas Committee on Natural Resources, the City of Texarkana,

---

[15] The plan's purpose is to "provide for the orderly development, management, and conservation of water resources and preparation for and response to drought conditions, in order that sufficient water will be available at a reasonable cost to ensure public health, safety and welfare; further economic development; and protect the agricultural and natural resources of the entire state." TEX. WATER CODE § 16.051(a).

[16] The site, appearing as the "Naples Reservoir" in the 1968 water plan, was later renamed the "Marvin Nichols Reservoir" in the 1984 Texas Water Plan of TWDB. (Louis A. Beechrl, Sr., Chairman).

local municipalities and regional water districts, the United States Fish and Wildlife Service, the Environmental Protection Agency, and the Texas Commission on Environmental Quality. Most of the comments received supported the mitigation bank, however "all of the agencies" expressed concern with the location of the proposed mitigation bank within the footprint of the Marvin Nichols Reservoir. Local municipalities and regional water districts opposed the mitigation bank proposal.

The TWDB responded by letter, dated December 9, 2004, to the Corps' request for comment, explaining how the permit could affect its interests and observing that the mitigation bank could potentially render the Reservoir project less viable or infeasible. The TWDB opined that approval of Hearts Bluff's mitigation bank would "not prevent construction of a reservoir," but it would require a re-analysis of the water management strategy for the Dallas and Fort Worth region of the State. The TWDB advised that it opposed the permit's approval.

The USACE denied the permit application in July 2006.[17] A year later, in May 2007, the Legislature approved the TWDB's 2006 water plan, thus conferring upon the Marvin Nichols Reservoir site the designation as a "unique" potential reservoir site. TEX. WATER CODE § 16.051(g). The Corps' stated reason for denying the application was that the mitigation bank would not exist in perpetuity if the Legislature chose to build the Reservoir. Hearts Bluff then applied for a limited-term mitigation bank permit, but the Corps denied this request because mitigation banks must be perpetual. Hearts Bluff later applied again, but the Corps once again denied the permit in July 2008.

## II. Procedural Posture

---

[17] Hearts Bluff represents that its mitigation banking permit application is the only one that has ever been denied by the Corps.

Hearts Bluff brought an inverse condemnation claim against the State of Texas and the TWDB (collectively the "State"), asserting a regulatory taking under both the Texas and United States Constitutions and seeking $30 to $70 million in damages. In its Second Amended Original Petition, the live pleading, Hearts Bluff alleges that the Corps denied the mitigation banking permit solely because the "mitigation bank was located within the footprint of a reservoir that was a unique reservoir site suitable for construction, that was to be and actually was adopted by the State legislature." It joined the Corps in the suit, because the Corps made the decision to deny the mitigation bank application. The Corps removed the case to federal court, and the federal district court severed the claims, transferring the case against the Corps to the United States Court of Claims and remanding the case against the State to state court. In a written opinion, the Court of Claims dismissed Hearts Bluff's case. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1327 (Fed. Cir. 2012), *cert. denied*, 2012 WL 1390200 (U.S. June 18, 2012) (No. 11-1264).

Earlier this year, the United States Court of Appeals for the Federal Circuit affirmed the holding of the Court of Claims, explaining that:

> [T]he Corps' discretionary denial of access into the Corps [mitigation bank] program cannot be a cognizable property interest. As Hearts Bluff does not have a property interest in access to the program, it likewise does not have a property interest in the program's related benefits, such as the mitigation banking instrument and credits.

*Id.* at 1331–32.

In state court on remand, the State filed a motion to dismiss and plea to the jurisdiction, arguing that Hearts Bluff failed to plead a valid takings claim for which sovereign immunity was waived. The trial court denied the State's plea to the jurisdiction. 313 S.W.3d at 484. The court of appeals reversed the trial court's denial and dismissed the case for lack of subject matter jurisdiction.

*Id.* at 490. The appeals court concluded that Hearts Bluff failed to make the required showing of a viable claim, reasoning that Hearts Bluff's pleadings, taken as true, affirmatively negated the existence of jurisdiction over its claim. *Id.* at 490. Assuming the Corps' denial of the permit was a current, direct restriction on Heart Bluff's property rights, the court of appeals concluded that the State's conduct did not cause the restriction because neither the Legislature nor the TWDB were empowered to grant or deny the permit. *Id.* at 489. The court of appeals did not reach the issue of whether the State's designation of the property as unique constituted a direct, current restriction on the land because it held the State's undisputed absence of authority to deny the permit to be dispositive. *Id.* Hearts Bluff filed a petition for review in this Court.[18]

### III. Standard of Review

Whether a court has subject-matter jurisdiction is a question of law, which we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Sovereign immunity, unless waived, shields the state from lawsuits for damages. *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 405 (Tex. 1997). In the absence of a properly pled takings claim, the state retains immunity. *See Gen. Servs. Comm'n v. Little-Tex Insulation Co. Inc.*, 39 S.W.3d 591, 598–99 (Tex. 2001). In reviewing a grant or denial of a plea to the jurisdiction, we determine whether the plaintiff's pleadings, construed in favor of the plaintiff, allege sufficient facts affirmatively demonstrating the court's jurisdiction to hear the case. *Miranda,* 133 S.W.3d at 226; *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 936 (Tex. 1988). If evidence central to the jurisdictional issue is submitted, it should be considered in ruling on the plea to the jurisdiction. *Miranda*, 133 S.W.3d

---

[18] Texas Farm Bureau, Texas Association of Dairymen, Texas Forestry Association, Texas Poultry Federation, and Our Land Our Lives collectively submitted an amicus curiae brief in support of Hearts Bluff's petition for review.

at 227. Evidence submitted with the plea may rebut the pleadings and undermine waiver of immunity. *Id.* at 227–28; *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

## IV. Inverse Condemnation Jurisprudence

Private property ownership is a fundamental right in the United States. *See Severance v. Patterson*, ___ S.W.3d ___ (Tex. 2012) (quoting *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977)). "The right of property is the right to use and enjoy, or dispose of the same, in a lawful manner and for a lawful purpose." *City of Wink v. Griffith Amusement Co.*, 100 S.W.2d 695, 700 (Tex. 1936) (citation omitted). Hearts Bluff brought an inverse condemnation claim against the State. Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *United States v. Clarke*, 445 U.S. 253, 257 (1980); *City of Abilene v. Burk Royalty Co.,* 470 S.W.2d 643, 646 (Tex. 1971) ("The essence of an inverse condemnation proceeding is that property has been taken and the property owner is attempting to recover compensation therefor."). This dispute raises the question of when the State's actions affecting the regulation of property become a taking, compelling us once again to venture into the "sophistic Miltonian Serbonian Bog." *Sheffield*, 140 S.W.3d at 671 (Tex. 2004) (citations omitted); *see also* JOHN MILTON, PARADISE LOST 42, bk. II, ll. 592–94 (Gordon Teskey ed., Norton & Co. 2005) (1674) (describing the land beyond Lethe as "[a] gulf profound as that Serbonian bog / Betwixt Damiata and Mount Casius old / Where armies whole have sunk.").

Our case law on takings under the Texas Constitution is consistent with federal jurisprudence*. See, e.g.*, *City of Austin v. Travis Cnty. Landfill Co.*, 73 S.W.3d 234, 238–39 (Tex.

2002); *Mayhew,* 964 S.W.2d at 933–34. The Just Compensation Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V.[19] Similarly, Article I, section 17 of the Texas Constitution provides, in pertinent part, that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." TEX. CONST. art. I, § 17. We consider the federal and state takings claims together, as the analysis for both is complementary. *See, e.g.*, *Travis Cnty. Landfill Co.*, 73 S.W.3d at 238–39; *Mayhew,* 964 S.W.2d at 933–38.

Although determining whether a taking has occurred is a question of law**,** *see Mayhew*, 964 S.W.2d at 933; *City of Coll. Station v. Turtle Rock Corp*., 680 S.W.2d 802, 804 (Tex. 1984), courts generally eschew any "set formula" in determining how far is too far when performing a regulatory takings analysis, preferring to "'engag[e] in . . . essentially ad hoc, factual inquiries.'" *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)). The Supreme Court has frequently noted that whether a particular property restriction is a taking depends largely "upon the particular circumstances [in that] case." *Penn Cent. Transp. Co.*, 438 U.S. at 124 (citing *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958)); *see also United States v. Caltex*, *Inc.*, 344 U.S. 149, 156 (1952).

Notwithstanding the fact specific nature of takings cases, the Supreme Court has established a general framework against which courts apply the individualized facts of alleged regulatory takings. *Penn Central*, *Sheffield*, and *Mayhew* govern regulatory takings challenges and they set out three guiding factors. *Penn Cent. Transp. Co.*, 438 U.S. 104 (regulation of development of historic

---

[19] This constitutional protection has been incorporated through the Fourteenth Amendment to apply to the individual states. *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 175 n.1 (1985) (citing to *Chicago, B. & Q. R. Co. v. Chicago,* 166 U.S. 226, 241 (1897).

landmarks); *Sheffield*, 140 S.W.3d 660 (moratorium on development and rezoning of property); *Mayhew*, 964 S.W.2d 922 (denial of development application). First is the economic impact of the regulation on the claimant. *Penn Cent. Transp. Co.*, 438 U.S. at 124.[20] The second factor under *Penn Central* is the character of the governmental action. *Id.* The third consideration is the extent to which the regulation has interfered with the economic expectations of the property owner. *Id.*

In *Sheffield*, we began our analysis with another consideration for regulatory takings – the *Agins* "substantial advancement" test. 140 S.W.3d at 673. In *Agins v. City of Tiburon,* the Supreme Court stated that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests." 447 U.S. 255, 260 (1980). "[A] use restriction . . . may constitute a 'taking' if not reasonably necessary to the effectuation of a substantial public purpose." *Penn Cent. Transp. Co.*, 438 U.S. at 127; *see also Sheffield*, 140 S.W.3d at 673; *see Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 834 (1987) (quoting *Agins*, 447 U.S. at 260). Although since *Sheffield* the Supreme Court has changed its view of the *Agins* "substantially advances" test,[21] Hearts Bluff rightfully acknowledges that water management and conservation is a legitimate public use. Therefore, we need not discuss this consideration.

---

[20] Courts distinguish between physical invasions of private property and regulatory actions affecting the owner's property interest. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, *see, e.g.*, *United States v. Causby*, 328 U.S. 256 (1946), than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent. Transp. Co.*, 438 U.S. at 124. Also, land-use exaction cases– in which the government exacts dedication of a property interest, imposes a fee, or imposes conditions as a prerequisite of approval of development on an ad hoc basis–a are somewhat distinct types of regulatory takings matters. *See, e.g., Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 546–48 (2005); *Dolan v. City of Tigard,* 512 U.S. 374, 385–86 (1994); *Nollan v. Cal. Coastal Comm'n.,* 483 U.S. 825, 827 (1987); *see also Town of Flower Mound v. Stafford Estates Ltd. P'ship* 135 S.W.3d 620, 631 (Tex. 2004); *Turtle Rock Corp.*, 680 S.W.2d at 804–05.

[21] In its first opportunity to consider the validity of the *Agins* "substantially advances" test, the Supreme Court held that the test prescribes an inquiry in the nature of a due process test, not a takings test, and has no proper place in federal takings jurisprudence. *Lingle*, 544 U.S. at 548; *cf. Sheffield*, 140 S.W.3d at 673–74.

We now turn to clarify the basis of Hearts Bluff's claim and then consider the factors in a regulatory takings analysis.

## V. Takings Analysis Applied

### A. Hearts Bluff's Claim

In its December 2004 letter in response to the Corps' request for its viewpoint, the State explained that approval of a mitigation bank in the footprint of the possible Marvin Nichols Reservoir site may make the reservoir "a less viable, if not infeasible, project," but a mitigation bank "does not prevent construction of a reservoir." The TWDB also communicated its opposition to the establishment of a federal mitigation bank on the land. In 2007, the Legislature adopted the TWDB's proposed water management plan, which included the potential Marvin Nichols Reservoir site, conferring a "unique" designation on the site.

Hearts Bluff's allegations about the cause of the denial of the mitigation banking permit, and the taking, have not been consistent. At the trial court, Hearts Bluff pled that several actions by the State, individually and together, constituted an intentional taking.

> The inclusion of Marvin Nichols by TWDB in the 2006 Region C Water Plan and the 2007 State Water Plan, the approval of the 2006 Region C Water Plan and the 2007 State Water Plan by TWDB, the adoption of such plans by the Legislature, the declaration of Marvin Nichols as a unique reservoir site suitable for construction, the authorizing of the *Reservoir Site Protection Study* and the affirmative statements that Marvin Nichols Reservoir would be constructed, among other things, individually and cumulatively, caused the denial of the permit by the Corps and resulted in the taking . . . .

A few paragraphs above that, Hearts Bluff's live pleadings give a single reason for the alleged taking: "[T]he Corps denied Hearts Bluff's request for a mitigation bank because the mitigation bank was contained within the footprint of the proposed Marvin Nichols Reservoir."

In this Court, Hearts Bluff changed its position on some of the reasons it cited in its trial court pleadings as the causes for the denial of the federal mitigation bank permit. It acknowledges that the TWDB's Reservoir Site Protection Study, that it had argued was intended to prohibit private development in the reservoir site, is not the cause of the alleged taking.[22] We agree for an additional reason. The Study was not published until July 2008, over a year after the Legislature adopted, in May 2007, the TWDB's 2007 Water Plan that created the unique designation for the Marvin Nichols reservoir site.[23] Hearts Bluff also is clear at this Court that it "does not contend that the mere fact that Marvin Nichols has been in State Water Plans for the last forty-three years is a taking." "[I]f that was all that happened, this lawsuit wouldn't have been filed."

Hearts Bluff also concedes in this Court that state agencies must be able to "lobby or advocate" in connection with questions that arise in connection with federally issued permits, and such lobbying in a "federal regulatory context" is not actionable.[24]

In this Court, Hearts Bluff contends, "[w]hat is important about the 2007 State Water Plan is that it recommended Marvin Nichols for the first time as a unique reservoir site, which the Legislature adopted as the State's official water policy. TEX. WATER CODE § 16.051(b) and (g-1)." Hearts Bluff then focuses its legal position on this issue: the "declaration of a unique reservoir site

---

[22] "[T]he State argues that the Reservoir Site Protection Study is not a current direct restriction. Hearts Bluff never said it was . . . . And, if all the State had ever done was issue a Reservoir Site Protection Study, Hearts Bluff would have gotten its permit." Petitioner's Reply Brief to Respondent's Brief on the Merits at 16 n.12.

[23] At the trial court, Hearts Bluff also alleges that the Study was intended to inhibit private development in the reservoir footprint until the property could be acquired, but this argument also suffers from the temporal problem with the date of the Study's publication and the date of the unique designation. The Corps denied the permit in July 2006; the unique designation occurred in May 2007.

[24] "If all the State had done was lobby or advocate for a result, Hearts Bluff would have gotten its mitigation bank permit." Petitioner's Brief on the Merits at 21–22, n.6.

was the factual cause of the denial of the permit." That declaration had a direct and immediate consequence because it "destroyed the perpetuity requirement for mitigation banking and caused the Corps to deny the permit . . . ." The designation also allegedly prohibited private development of the property when allegedly there were "no restrictions on Hearts Bluff's ability to develop its property at the time it purchased it." Hearts Bluff claims that applying the unique label to the reservoir site changed the character of the State's interest in the property.

Reasonably construing Hearts Bluff's pleadings against the State in light of our precedents, we consider whether the Legislature's adoption of the TWDB's 2007 Water Plans and the State's entering a Reservoir Site Protection Study is governmental action that constitutes a taking, or stated another way, caused the Corps to deny the mitigation banking permit.

## B. Nature of the Governmental Actions that Constitute Takings

### 1. Direct Governmental Restriction

We have held that a lack of a direct governmental restriction of the owner's use of her land or a lack of regulatory authority over the land-use decision at issue is dispositive in takings cases. *See, e.g.*, *Westgate*, *Ltd. v. State*, 843 S.W.2d 448, 450 (Tex. 1992); *see also San Antonio River Auth. v. Garrett Bros.*, 528 S.W.2d 266, 271 (Tex. Civ. App.—San Antonio 1975, writ ref'd n.r.e.). However, where courts have found direct governmental actions in which the governmental defendant had regulatory authority over the matter causing the plaintiff's harm, they have generally found a taking. *See, e.g., City of Austin v. Teague*, 570 S.W.2d 389, 393–94 (Tex. 1978). Those cases generally involve current, direct restrictions on the property and may be combined with facts tending to show bad faith. *See,* e.g., *Westgate,* 843 S.W.2d at 452, 454; *see also Teague*, 570 S.W.2d at 393. While a statement of intent influencing another actor with final regulatory authority, as is the case

- 14 -

here, lies somewhere in the middle of these two factual scenarios, we conclude that the factual

pleading in this case and the evidence[25] considered along with it do not support a regulatory taking.

The State's argument likening this case to our opinion in *Westgate* has merit. In that case,

we concluded there was no taking when the State and the City of Austin publicly announced plans

to condemn the plaintiff's land, impairing the plaintiff's ability to lease its shopping center.

*Westgate,* 843 S.W.2d at 450–51, 453. We held that "publicly targeting a property for

condemnation" in the future does not give rise to an inverse condemnation. *Id.* at 453. The plaintiff

sought to recover lost profits for the three year period between the public announcement of the

State's plans for the property and the actual condemnation. *Id.* at 451. Although the announcement

resulted in economic harm to the plaintiff, we confirmed that the "impact of the future project on the

present market value of the land was a noncompensable consequential damage." *Id.* at 453 (citing

*Hubler v. City of Corpus Christi*, 564 S.W.2d 816, 821 (Tex. Civ. App.—Corpus Christi 1978, writ

---

[25] *See* Defendant's First Amended Motion to Dismiss, *Hearts Bluff Game Ranch, Inc. v. Texas*, __ S.W.3d __ (Tex. 2012) (No. D-1-GN-08-002450) (Exhibit A, Plaintiff's First Amended Original Petition; Exhibit B, Letter from Chief, Regulatory Branch, USACE, Fort Worth District to Hearts Bluff Game Ranch, 2006; Exhibit C, Region C Water Plan, 2001; Exhibit D, Water for Texas, 2002; Exhibit E, Region C Water Plan, 2006; Exhibit F, Water for Texas, 2007; Exhibit G, Letter from Texas Water Development Board to Regulatory Branch, USACE, 2004; Exhibit H, Water for Texas 1997; Exhibit I, Texas Water Plan 1990; Exhibit J, Water for Texas, 1984; Exhibit K, Texas Water Plan 1968; Exhibit L, Hearts Bluff's Objections, Answers & Responses to State's First Set of Interrogatories & Request for Production). The State requested the trial court to admit these exhibits as evidence because they:

> constitute official records of a state or federal agency, court pleadings, or responses to discovery, and the sources do not indicate a lack of trustworthiness. Accordingly, as allowed by Tex. R. Evid. 801 & 803, Defendants request that these exhibits be admitted as evidence for consideration by the Court. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547 (Tex. 2000). (Defendants' First Amended Motion to Dismiss at ¶ 18; Defendants' Supplemental Motion to Dismiss at ¶ 18).

The trial court considered the "motions, responses and replies and the evidence and arguments of counsel" in making its ruling. Order Denying Defendants' Motion to Dismiss. Hearts Bluff asserted no objections to the evidence, submitted evidentiary exhibits of its own in response to the motion to dismiss and relied on the State's exhibits in its response to the motion to dismiss at the trial court. In this Court, both parties also rely on and argue information from the trial court exhibits. We will likewise consider the evidence in reviewing the issues in the case. *See Miranda*, 133 S.W.3d at 227 (evidence necessary to the plea is to be considered).

ref'd n.r.e.)). We concluded that, in order for an inverse condemnation claim to be valid, there must be a "current, direct restriction" on the use of the land, referring to a physical act or legal restriction on the property's use, "such as a blocking of access or denial of a permit for development." *Id*. at 452. The threat of "some possible future loss" was insufficient to establish an inverse condemnation. *Id.* at 453.

Hearts Bluff asserts that the denial of the permit itself is a current, direct restriction on Hearts Bluff's ability to develop its property. The State, along with some 300 other parties, responded to the USACE's public request for information and lobbied it with respect to the State's interest, as pled by Hearts Bluff. The State did not, however, under any facts pled or evidence in the record, have the authority to deny the federal permit. In fact, Hearts Bluff admits that only the Corps had the authority to deny the mitigation banking permit. Even if the State had a persuasive role in the Corps' action, just as an announcement to condemn is not a direct restriction on the land, identifying bottomland as a potential water storage site is not a direct restriction. *See Westgate*, 843 S.W.2d at 453. The State's plans for the reservoir in this case are even less concrete than the public statement by the State in *Westgate* of its intention to condemn the land in the future. In *Westgate* we held that "publicly targeting a property for condemnation, resulting in economic damage to the owner, generally does not give rise to an inverse condemnation cause of action unless there is some direct restriction on use of the property." 843 S.W.2d at 453 (citations omitted). It would strain our precedent to conclude that publicly targeting a property for condemnation when the delay of the actual condemnation caused the landowner damages *is not* a taking, but a mere identification of a location as a potential reservoir that may never be condemned *is* a taking. Governmental conduct

- 16 -

in combination with such a designation that legally restricts or prevents private development or use of the land may change the analysis, but such conduct is not at issue in this case.

However, because the plaintiff in *Westgate* did not allege that the government intentionally acted to depreciate the value of the property at issue, the dissent points to language in that opinion that "[t]he policy reasons that support our decision today might not be applicable where the condemning authority is accused of intentionally injuring a landowner." *Id.* at 454. The dissent takes a different approach from the Court. In *Westgate*, the Texas State Department of Highways and Public Transportation announced its decision to condemn the developer's property *after* it had already approved the developer's planned shopping center development and physical construction had begun. *Id*. at 450. The State approved the developer's site plan and the developer had started construction, yet the State had not given Westgate notice of its pending plans to expand its highway project into the development. *Id*. In *Westgate*, the State had the authority to approve or refuse the developer's plans and the State's condemnation was certain—it happened. *See id.* at 450-51. For each of these key facts, in the instant case the result is the converse. The State's identification of the site as a potential reservoir occurred decades before Hearts Bluff sought to commercially develop it, Hearts Bluff was on notice of the designation and its investment backed expectations were different from those in *Westgate*. There are no allegations in this case that the State misled the owner while it proceeded furtively with plans that would damage the property interest.[26] Here the facts were known and the State properly gave the Corps its honest and longstanding assessment of the State's potential plans for the Marvin Nichols Reservoir site. And, importantly, the State did not

---

[26] Hearts Bluff alleged that the Corps misled it on the permit. The Federal Circuit dismissed these claims. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326. *See* further discussion *infra* __ S.W.3d at __.

have the authority to approve Hearts Bluff's development plans. *Westgate's* holding that "publicly targeting a property for condemnation" is not a taking is broader than necessary to squarely support our decision. *See id.* at 453.

In *Garrett Brothers*, in which there was evidence of intentional action, the governmental entity at issue was found not liable for a taking. *See Garrett Bros.,* 528 S.W.2d at 273. A landowner sued both the City of San Antonio and the San Antonio River Authority (SARA) after San Antonio purposely delayed the plaintiff's development of a subdivision, acting on the advice of SARA. *Garrett Bros.,* 528 S.W.2d at 269–70. The plaintiff began developing its land after obtaining a permit from San Antonio. *Id.* at 269. However, SARA and San Antonio developed alternate plans for the property, realizing that it would be more expensive to acquire the plaintiff's land if the plaintiff continued to build the subdivision. *See id*. at 268–69. After repeated discussions with SARA, San Antonio instructed various municipal agencies and departments to discontinue services to the plaintiff's subdivision to impede the plaintiff's development. *Id*. at 270. After a delay of over five months, SARA informed San Antonio that the plaintiff's further development no longer presented a problem, at which point the plaintiff was allowed to continue its development. *Id.*

When the plaintiff sued both parties for damages arising from the delay, the court of appeals affirmed a jury award against the City of San Antonio. *Id*. at 280. However, the court also concluded that, because SARA did not possess any regulatory authority over the governmental entities that caused the damage—the municipal agencies and San Antonio—it could not be liable for a regulatory taking, notwithstanding the fact that SARA urged San Antonio to intentionally delay the development until it decided whether it wanted to acquire the plaintiff's land. *Id*. at 269, 271–72.

The opinion observes, "SARA wholly lacked the authority to interfere with plaintiff's development of the subdivision under any circumstances." *Id.* at 271.

*Garrett Brothers* is close to directly on point, as both SARA and the TWDB are similarly situated and their communications were similar. Each communicated its desires and opinions to a governmental entity with regulatory authority to take action affecting the property. Like SARA in relation to San Antonio, the TWDB made its opinion known to the Corps but had no authority to take the action affecting the owner's property rights. SARA further sought a cooperation agreement between it and San Antonio.

As *Westgate*'s focus on direct action implies, causation is an issue to be considered by Courts in takings cases.[27] This is not the first time courts have addressed causation in a takings action. In 1941, we held that the "true test" is whether the State's intentional acts "were the proximate cause of the taking or damaging of such property." *State v. Hale*, 146 S.W.2d 731, 737 (Tex. 1941)

---

[27] As both the State and Hearts Bluff observed during argument, because this is a plea to the jurisdiction, this Court must construe the facts pled liberally in favor of Hearts Bluff unless those facts are rebutted by evidence submitted with or against the plea. *See Miranda*, 133 S.W.3d at 226–27. Because Hearts Bluff pled that the State was the factual cause of the Corps' denial of the permit, the State conceded that was Hearts Bluff's position, but the State repeatedly asserted that it was not the cause. At oral argument, the State confirmed this:

> We don't agree that we have any power over the [Corps] to do that. Now I think what we asked the court was to please site your habitat for migratory water fowl somewhere else. Now whether that "please" had an influence on the Corps I think we have to accept for the purposes of appeal that [as] a factual matter it did, but we disagree that the Corps. [sic] The Corps had discretion to deny it.

Perhaps the State could have been more precise; however, the State has consistently maintained throughout its briefing and argument in this Court, at the court of appeals, and in the trial court that it lacked the authority to grant or deny the federal permit, lacked any regulatory authority over the Corps, and that it believed it could not be held responsible for Hearts Bluff's harm. *See, e.g.*, Defendant's First Amended Motion to Dismiss at 10. ("Hearts Bluff's assertions that the Defendants['] actions constitute 'direct restrictions' are spurious, since the decision to deny the application was made by the Corps."); Brief of Appellants at 13, 313 S.W.3d 479 (Tex. Civ. App.—Austin 2010) (No. 03-09-00598-CV) ("[T]he denial of the mitigation-banking permit cannot constitute a taking by the State of Texas or TWDB because they are powerless to grant or deny such permits . . . "); Respondent's Brief on the Merits at 4. ("[T]he State had no regulatory authority over the action (the refusal to enter into a mitigation banking agreement) that is the centerpiece of Hearts Bluff's complaint.").

- 19 -

(holding that a "direct, physical invasion of the property" was not necessary under the 1876 Constitution for a taking to occur); *see Roberson v. City of Austin*, 157 S.W.3d 130, 138 (Tex. App.—Austin 2005, pet. denied); *Brandywood Hous., Ltd. v. Tex. Dep't. of Transp.*, 74 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2001, pet. denied); *City of Dallas v. Ludwick*, 620 S.W.2d 630, 632 (Tex. Civ. App.—Dallas 1981, writ ref'd n.r.e.) (showing proximate cause is necessary in a takings case where city denied building permit). Proximate cause is an essential element of a takings case. "[W]ithout causation, there is no 'taking.'" *Tarrant Reg'l Water Dist. v. Gragg*, 43 S.W.3d 609, 615 (Tex. App.—Waco 2001), *aff'd*, 151 S.W.3d 546 (Tex. 2004). We affirmed that the State's construction of a reservoir was the cause of flood water damage to farmland. *Id*. at 555. The Supreme Court identified the role of proximate cause in takings cases in *Penn Central*, noting that "whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case.'" *Penn Cent. Transp. Co.* 438 U.S. at 124 (citing *Cent. Eureka Mining Co.*, 357 U.S. at 168). We have also used the terms "occasioned by the fault of," "to result from," and "arise out of" as proxies for the requirement that the State's intentional acts be the proximate cause of the taking, destruction, or damage to private property. *See Steele v. City of Houston*, 603 S.W.2d 786, 791 (Tex. 1980); *City of Del Rio v. Felton,* No. 04-06-00091-CV, 2007 WL 247655, at *6 (Tex. App.—San Antonio Jan. 31, 2007, no pet.) (mem. op.); *San Antonio Hous. Auth. Found., Inc. v. Smith*, No. 04-10-00759-CV, 2011 WL 3627699 at *3 (Tex. App.—San Antonio Aug. 17, 2011, no pet.) (mem. op.). We also addressed causation in *Westgate*, concluding that there must be a "direct restriction" on the use of the land to establish a taking. 843 S.W.2d at 452–53. The word "direct" seems plainly to indicate that the governmental entity must be the cause of the harm. This "direct restriction" language is

often quoted by other Texas courts analyzing takings allegations.[28] The Ninth Circuit has held that the plaintiff in takings cases must establish all elements of proximate causation. *Esplanade Props., LLC v. City of Seattle*, 307 F.3d 978, 984 (9th Cir. 2002) (citations omitted). Construing *Penn Central's* reference to proximate causation, Chief Justice Rehnquist also argued that ordinary principles of proximate cause govern the causation inquiry for takings claims. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 344–45 (2002) (Rehnquist, C.J., dissenting).

Causation is intrinsic to a takings claim. The governmental entity sued must have taken direct governmental action, or have been the proximate cause, of the harm. Here, neither TWDB nor the State of Texas satisfied that requirement. Instead, that characterization fits the Corps, as the only body with regulatory authority to grant or deny mitigation banking permits.

In *State v. Biggar*, the government defendant had the authority to and imposed direct restrictions on the use of property and we held its actions made the State liable for inverse condemnation. 873 S.W.2d 11, 11–12, 14 (Tex. 1994). The State denied the plaintiffs an otherwise routine real estate transaction in order to lower the value of the plaintiffs' property before acquiring the land by eminent domain. *Id*. The plaintiffs obtained initial approval of a site development plan (SDP) from the City of Austin, contingent upon the completion by a given date of a routine easement exchange with the State. *Id*. at 11–12. The State initially approved the easement exchange. *Id.* at 12. Later, however, the State realized it needed the plaintiffs' land for a highway expansion but

---

[28] *See, e.g.*, *Schriver v. Tex. Dep't of Transp.*, 293 S.W.3d 846, 850 (Tex. App.—Fort Worth 2009, no pet.); *Cozby v. City of Waco,* 110 S.W.3d 32, 38 (Tex. App.—Waco 2002, no pet.); *City of Grand Prairie v. M.B. Capital Investors Inc.*, No. 05-95-00921-CV, 1996 WL 499790, at *6 (Tex. App.—Dallas Aug. 27, 1996, writ dism'd) (not designated for publication).

plaintiffs declined to sell at the value offered. *Id.* The State then denied the easement exchange, and the SDP lapsed nearly five months later. *Id.* The State then condemned the land at a significantly lower price. *Id.* Plaintiffs asserted that the State acted in bad faith. *Id.* at 13–14.

In *Biggar*, we recognized an inverse condemnation claim in part because of the State's bad faith in using its power to gain an unfair economic advantage over the property owner. *Id.* at 13. Although the State operated well within its discretion in denying the easement exchange, and although the State was not directly involved with the SDP's expiration, the State intentionally refused to participate in the routine easement transaction to allow the SDP to expire and enable it to acquire the land at a lower cost. The State took action within its power to halt a prerequisite to Biggar's development plan, apparently specifically designed to decrease the value of the landowners' property. *Id.* at 14.

As the dissent observes, this case presents some factual similarities to *Biggar*. However, legally this case is materially different. First, in *Biggar*, the State had the authority and the ability to take the action, rejecting the conveyance of its easement, that injured the landowners. The City had approved the SDP. The State unilaterally acted to push the landowners past the deadline to act on the City's SDP and foreclosed the landowners' opportunity to develop, thereby causing reduction in the value of their land. *Id.* at 14. The State made the decision and had the authority to take the intentional act that halted the plaintiff's development. In this instant case, the State did not change its decision to convey a public easement, deny a permit, or refuse a zoning change. It provided accurate and honest input requested by the Corps. The dissent argues, "The Court incorrectly suggests that the State cannot have acted in bad faith in this case because the State 'merely responded' to the Corps' request for public comment on Hearts Bluff's mitigation banking

application. Yet all the State did in *Biggar* was 'merely' refuse to relinquish an easement it owned." __ S.W.3d __ (Hecht, J., dissenting). We do not equate the mere provision of information in this case with the State's intentional countermanding in *Biggar* of its agreement to exchange the easement, which resulted in harm to the property owner.

The Corps alone had the authority to grant or deny the mitigation banking permit. The Corps could have shunned or accepted the State's best arguments about plans for the Marvin Nichols Reservoir. The State had no authority over the Corps and none over Hearts Bluff's desired mitigation bank. It had no opportunity to cause a crucial project-ending delay, as did the State in *Biggar*. Hearts Bluff argues that identifying the land as a potentially valuable reservoir site to the Corps is tantamount to causing the denial of the permit. The parties cite no cases in which a party stated a takings claim against a state government when the federal government had the sole and exclusive authority to deny the development permit at issue and did so. Without more, we decline to recognize such a claim.

The dissent concedes that *Teague* and *Garrett Brothers* support the Court's opinion. __ S.W.3d __ (Hecht, J., dissenting) ("The court noted that in both *Teague* and *Garrett Brothers*, takings liability was imposed on the entity with regulatory power."). In *Teague*, we concluded that actions by the City of Austin resulted in a taking when, after unsuccessfully requesting that the State acquire a scenic easement in the plaintiff's land, Austin denied the plaintiff's water development application, despite his compliance with all of the requirements of the existing ordinance. 570 S.W.2d at 390. After denying the plaintiff's second application and refusing to purchase his land, Austin passed an ordinance requiring any developer to preserve "the natural and traditional character of the land and waterway to the greatest extent feasible." *Id*. at 390–91. The ordinance foreclosed

development of plaintiff's land and imposed a scenic servitude upon the property. *Id.* at 394. We held that Austin could not accomplish through an ordinance of general application what it had no power to do specifically, which was to essentially acquire a scenic easement in the plaintiff's land without just compensation. *Id.* In *Teague*, Austin had the authority to pass the ordinance that would cause harm to the claimants, and it did. Whereas, here, the harm from the permit denial was not at the hands of the State.

Hearts Bluff pled, as the dissent points out, that the Corps told it there were no impediments to the mitigation bank's creation. Hearts Bluff assented, "The Corps told Hearts Bluff that the rumored but never established Marvin Nichols Reservoir would not inhibit the granting of a mitigation banking permit for Hearts Bluff." The State advised the Corps, in evidence submitted with the plea to the jurisdiction, that it confirmed to the Corps that "the [Hearts Bluff mitigation bank] does not prevent construction of a reservoir." But alleged misrepresentations, or even changes in positions, on the possibility of creating a mitigation bank in an actual reservoir was an issue Hearts Bluff had with the Corps. The Federal Circuit reviewed these allegations in Hearts Bluff's case against the Corps and held that these alleged misrepresentations are not actionable:

> [R]elying on representations by the Corps in purchasing the land in the hope that the government will grant a discretionary mitigation banking permit does not create a compensable property interest. At its core, Hearts Bluff argues that it detrimentally relied on the promises and representations of the Corps. Such detrimental reliance, however, does not create a property right under takings law.

*Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d at 1332.

Federal case law on the authority of relevant governmental actors in a takings case also reinforces our reasoning in this case. In *B & G Enterprises*, the court held that state action could only be attributable to the federal government in regard to takings liability if state actors were

- 24 -

"agents" of the federal government. *B & G Enters. v. United States,* 220 F.3d 1318, 1325 (Fed. Cir. 2000). In that case, the owner and operator of vending machines in California alleged a regulatory taking against the federal government based on the California Legislature's enactment of restrictive regulations on the use of tobacco vending machines. *Id.* at 1322. A federal agency conditioned California's receipt of grant money on its passing and enforcing laws regulating minors' access to tobacco products. *Id*. at 1321. "The proposed [federal] regulation did not make tobacco vending machine restrictions a condition of the receipt of the federal block grant, but the [regulating body] did *suggest* that states ban tobacco vending machines or restrict their placement . . . ." *Id.*

The Court held that the federal government was not a regulator and thus could not be held liable for a taking for several reasons. *Id*. at 1323–24. One reason was that California's Legislature could not be considered as acting under federal authority. *Id*. at 1324. Specifically, California had the discretion to enact the law or to decline to do so, making it irrelevant that the federal government advised California that it should pass the regulations. *Id.*

The California Legislature in *B & G Enterprises* and the City in *Garrett Brothers* occupy positions similar to the TWDB in this case. In *B & G Enterprises*, while the federal government's advice may have influenced California's enactment of the restrictive regulations, the decision to act on or ignore that advice was solely California's. *Id.* Similarly, in *Garrett Brothers*, while SARA's land-use plans may have motivated and, perhaps, guided San Antonio in impeding the plaintiff's development, the City of San Antonio was the entity liable for taking the plaintiff's property because only it had the power to regulate. *Garrett Bros.,* 528 S.W.2d at 271.

Here, the decision was the Corps'. It would strain the concept of federalism to contend that the Corps acted under the authority of the State. *See Rapanos v. United States*, 547 U.S. 715, 721

- 25 -

(2006) ("In deciding whether to grant or deny a permit, the [Corps] exercises the discretion of an enlightened despot, relying on such factors as 'economics,' 'aesthetics,' 'recreation,' and 'in general, the needs and welfare of the people.'") (citing 33 C.F.R. § 320.4(a) (2004)).  Nor can we can we conclude that the Corps, under the facts alleged, was acting as an "agent" of the State.  *See B & G Enters.,* 220 F.3d at 1323.  The Corps, a federal political subdivision implementing federal law and federal policy, is directed to make its decision on Hearts Bluff's application based on federal guidelines.  *See* 33 C.F.R. § 320.4(a) (requiring a "public interest review" prior to permit issuance).  Hearts Bluff acknowledged that the Corps "is the governmental agency responsible for permitting and administering mitigation banks pursuant to § 404 of the Clean Water Act."  In sum, Hearts Bluff pled that the State influenced the Corps to deny Hearts Bluff's permit application.  Because the State had no authority to approve or refuse the necessary permit for Heart Bluff's development, it will generally not be subject to an inverse condemnation claim for the denial of a federal permit to commercially develop the property.

Even if Hearts Bluff could clear the hurdle of the State's lack of authority to act on its permit application, courts are not required to accept as true parts of its pleadings that are actually legal, rather than factual, allegations.  *See Fain v. Great Spring Waters of Am., Inc.*, 973 S.W.2d 327, 329 *aff'd*, *Sipriano v. Great Spring Waters of Am., Inc.*, 1 S.W.3d 75 (Tex. 1999).  The statement that creation of a mitigation bank would preempt the development of the reservoir is not admitted by the State, which argues that position may be wrong as a matter of law, as the TWDB advised the Corps in its response letter.  In addition, Hearts Bluff claims that the main purpose of the unique designation is to invoke the State's protection of the site from private development.  In its 2007 water plans, the TWDB recommended that the Legislature designate Marvin Nichols Reservoir as

unique pursuant to section 16.051(g) of the Texas Water Code. And in May 2007, the Legislature's approval of the TWDB's state water plan automatically resulted in that designation being conferred on the Marvin Nichols Reservoir site. However, the unique designation's purpose, expressed in the statute, is to preclude other governmental units in Texas from acquiring an interest in it. *See* TEX. WATER CODE § 16.051(g).[29] Hearts Bluff cites no authority for its assertion that a unique designation legally inhibits or prevents private development of the site, and the statutory provision itself limits only state governmental entities from pursuing an interest in the reservoir site. The Corps denied Hearts Bluff's application in July 2006, with no mention of the possible unique designation.[30]

## 2. Bad Faith

Whether the governmental entity acted in bad faith may also be a consideration in determining whether a governmental action gives rise to a compensable taking. *See, e.g.*, *Teague,* 570 S.W.2d at 393 (noting that courts also allow for recovery of damages when the government takes action against the economic interests of a property owner for its own advantage); *Sheffield,* 140 S.W.3d at 678 ("Beyond the three *Penn Central* factors, we are concerned, as we have already indicated, about the City's conduct."). Bad faith, from the viewpoint of the petitioners, was likely in play in *Garrett Brothers*, as both San Antonio and SARA attempted to extract a better sales price or condemnation value out of the plaintiff. *See Garrett Bros.*, 528 S.W.2d at 269. However, SARA

---

[29] "The legislature may designate a site of unique value for the construction of a reservoir. A state agency or political subdivision of the state may not obtain a fee title or an easement that would significantly prevent the construction of a reservoir on a site designated by the legislature under this subsection." TEX. WATER CODE § 16.051(g).

[30] Absent affirmative action specified, the designation terminates in 2015. TEX. WATER CODE § 16.051(g-1) ("The designation of a unique reservoir site under this subsection terminates on September 1, 2015, unless there is an affirmative vote by a proposed project sponsor to make expenditures necessary in order to construct or file applications for permits required in connection with the construction of the reservoir under federal or state law.").

had no regulatory authority to act to harm Garrett Brothers in this circumstance, and was thus not liable. *Id.* at 271–72. There is no evidence in the record showing that the State acted in bad faith.

However, even assuming that the State acted in bad faith in designating the site as unique or influencing the Corps to deny Hearts Bluff's permit, that point is not necessarily dispositive. *See, e.g.*, *Sheffield*, 140 S.W.3d at 678–79, 681 (although we expressed concern with the City's conduct in which it attempted to take unfair advantage of the plaintiff, we reversed in favor of the City); *see also Garrett Bros.,* 528 S.W.2d at 269, 271 (although bad faith was likely involved in the actions of San Antonio and SARA, because SARA had no regulatory authority, it was held not liable). Evidence of bad faith is given due weight, but must be considered against other circumstances, including legitimate public benefits furthered by the action. In *Sheffield*, notwithstanding facts indicating that the City of Glenn Heights may have acted in bad faith, the Court nevertheless reversed the judgment of the court of appeals and rendered judgement that the developer take nothing against Glenn Heights. *Sheffield*, 140 S.W.3d at 678–79, 681. Thus, while Glenn Heights acted in bad faith, we considered all of the circumstances surrounding the case, not least of which was the legitimate government interest sought by Glenn Heights' actions, concluding that the restriction on the land was not unreasonable and did not amount to a taking. *Id*. at 678–79.

If the State had targeted one particular landowner and treated him unfairly, there might be more merit to the claim. *See Sheffield,* 140 S.W.3d at 676 ("[I]t ordinarily is, and should be, harder for the government to show that its interests have been substantially advanced by regulation directed at one lone landowner."); *Mayhew*, 964 S.W.2d at 936; *but see Garrett Bros*., 528 S.W.2d 269, 271 (although SARA and the State targeted only the plaintiff's development, SARA was not liable for a taking because of its lack of regulatory authority).

However, here, the identification of the Marvin Nichols site occurred over three decades before Hearts Bluff purchased the land. Pleading that the State presented its thirty-year old public position on the possible use of a reservoir site to the Corps at the Corps' request and lobbying for its position is, without more, insufficient to state a claim for a regulatory taking. Stated differently, the State does not commit a taking when it promotes its long-held position on potential reservoir sites to a federal agency that asks for its input. If that were the case, a recent purchaser of land in any of the 115 potential Texas reservoir sites could apply for the federal mitigation banking permit and prevent the State from even answering an inquiry from the Corps that the State's public interest could be involved. And neither the reservoir site nor the unique designation targeted a specific landowner, but instead encompassed many landowners and thousands of acres beyond Hearts Bluff's parcel. *See Sheffield,* 140 S.W.3d at 676 (stating that it is harder for a governmental entity to show that is has not committed a taking if it singles out one landowner); *Mayhew*, 964 S.W.2d at 937–38 (discussing that the Mayhews were not singled out by the City that had the authority to deny the permit). Hearts Bluff seeks a rule that a governmental entity that affirms the public's interest in property for water management and drought prevention, even though without the authority to prevent development, may be held liable for damages for a taking. Such a rule is too broad and contrary to long-standing precedent.

### 3. Public Policy

Public policy argues strongly for our result. The preservation of communication between governmental entities is an important public interest. Given the size and complexity of state and federal governments, it is imperative that political subdivisions generally have a free flow of communication to coordinate projects, strive for more efficiency, and better serve the public. To

- 29 -

effectively perform its mission, the TWDB must communicate freely with the Legislature. The State has a vital interest in communicating openly and candidly with the federal government and other state governments when Texas' interests are implicated in federal and interstate projects. Mere communications without authority are not actionable, whether it be between a state agency and the Legislature, between the federal government and the State, or between the State and another state government. The Legislature's designation of the Marvin Nichols site as unique for reservoir purposes does not give rise to a taking, as that designation is an announcement of potential future state action only binding against subdivisions of the State—not the Corps. *See Westgate*, 843 S.W.2d at 453.

The State's legitimate interest in communicating its water-planning priorities underscores the dramatic negative consequences of the dissent's position. The dissent's approach renders the State potentially liable for a taking any time its response to a request for public comment ultimately results in an economic gain to the State and a loss to a private entity. However, the State is consistently presented with questions and requests for input from the federal government on projects within Texas' borders. The dissent's position would require, to avoid potential takings liability, the State to say, "I cannot answer," to such requests for its views on any project affecting private property in which the State may also have a potential interest. We can only imagine the dramatic harmful consequences to Texas on many federal projects that impact our state's interest – whether transport, electric, energy, or other projects.

We would put the State in a difficult position if it must engage in a cost-benefit analysis, weighing its duty to act in the interests of the people versus defending a lawsuit, whenever it considers responding to requests for comment from a federal agency. If each time the State

communicated with the federal government it potentially could be sued based on the federal government's actions within its sole authority, it would have a chilling effect on those communications, and force the State to choose between actively asserting its interests and leaving the protection of Texas' interests to the federal government. That would be untenable.

## C. Economic Impact and Investment-Backed Expectations

A regulatory taking arises when the government imposes restrictions "unreasonably interfer[ing] with landowners' rights to use and enjoy their property." *Mayhew*, 964 S.W.2d at 935 (citing *Lucas*, 505 U.S. at 1015–19 & n.8; *Taub v. City of Deer Park*, 882 S.W.2d 824, 826 (Tex. 1994); *Teague*, 570 S.W.2d at 393). Determining whether the government has unreasonably interfered with a landowner's right to use and enjoy property requires consideration of two factors: 1) the economic impact of the regulation, and 2) the extent to which the regulation interferes with distinct investment-backed expectations. *Mayhew*, 964 S.W.2d at 935 (citing *Lucas*, 505 U.S. at 1019, n.8; *Penn Cent. Transp. Co.*, 438 U.S. at 124).

The first consideration, the economic impact of the regulation, "merely compares the value that has been taken from the property with the value that remains in the property." *Mayhew*, 964 S.W.2d at 935–36 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)). A regulatory taking occurs when the government imposes restrictions that deny landowners of all economically viable use of their property.[31] *Lucas*, 505 U.S. at 1015–19 & n.8; *see also Taub*, 882 S.W.2d at 826. A restriction relieves the landowner of all economically viable use of the

---

[31] The United States Supreme Court has softened its language regarding the loss of all economically viable use of land. *Tahoe-Sierra Pres. Council, Inc.*, 535 U.S. at 334–35. The Court observed that the brevity of the deprivation has to be considered, as courts must also account for the temporary loss of all economic value, such as delays in obtaining building permits and temporarily prohibiting access to crime scenes. *Id.*

property or totally destroys the value of the property if the restriction renders the property valueless. *See, e.g.*, *Turtle Rock Corp.*, 680 S.W.2d at 806.[32] The Supreme Court has held that the factors considered in a takings analysis are not a formulaic test, *Tahoe-Sierra Pres. Council*, 535 U.S. 302 at 326, and we observed that "the economic impact of a regulation may indicate a taking even if the landowner has not been deprived of all economically beneficial use of his property." *Sheffield*, 140 S.W.3d at 672.

Because Hearts Bluff's property is bottomland, its uses are more limited than other lands. There are other plausible uses of its land, e.g., the existing uses for hunting and fishing, although Hearts Bluff noted that the other possible uses would likely not justify the price that it paid for the land.[33] Hearts Bluff argues that the mitigation banking program is a profitable venture and its loss of the expectation of obtaining a valuable mitigation bank at the site is actionable. But this seems to be a risk common to land developers. *See Sheffield*, 140 S.W.3d at 677. The actions of the State do not constitute a taking simply because Hearts Bluff cannot earn as much money on its investment as it originally hoped. *See, e.g., Andrus v. Allard*, 444 U.S. 51, 66 (1979) ("Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform. Further, perhaps because of its very uncertainty, the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests.") (citation omitted). And the takings clause "does not charge the government with guaranteeing the profitability of every piece

---

[32] Some federal courts of appeal have pronounced that a taking occurs when the government does not allow any use that is "sufficiently desirable" to permit the property owner to sell the property. *See, e.g., Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996); *Park Ave. Tower Assoc. v. City of New York*, 746 F.2d 135, 139 (2d Cir. 1984); *but see Mayhew*, 964 S.W.2d at 935.

[33] Hearts Bluff asserts that it paid $475 an acre for the land and expected the value of the land to increase by somewhere between $10,000 to $25,000.

of land subject to its authority. Purchasing and developing real estate carries with it certain financial risks, and it is not the government's duty to underwrite this risk as an extension of obligations under the takings clause." *Sheffield*, 140 S.W.3d at 677 (citing *Taub*, 882 S.W.2d at 826). Hearts Bluff conceded there are indeed other actual and potential uses of the land.

Concerning its investment expectations, Hearts Bluff alleges that the State has caused it substantial damage since it can no longer use its property as a mitigation bank. Weighing the investment-backed expectations of the landowner, "[t]he existing and permitted uses of the property constitute the 'primary expectation' of the landowner that is affected by regulation." *Mayhew,* 964 S.W.2d at 936 (citations omitted); *see also Lucas*, 505 U.S. at 1016–17 n.7 (an owner's reasonable expectations are shaped by uses permitted by state law). The record does not clearly indicate all the uses of the parcel prior to Hearts Bluff's purchase. However, there is no evidence before us indicating that the State's actions in this case, whether it be communicating with the Corps or designating Marvin Nichols as a unique site, have affected any previously existing uses of the property. Hearts Bluff still has every use of the land available to it other than participation at this time in a federal mitigation banking program.

Hearts Bluff also argued that "the representations by the Corps that the land was suitable for a mitigation bank gave rise to a reasonable investment-backed expectation property interest." *Hearts Bluff Game Ranch, Inc.*, 669 F.3d 1326 at 1332. The Federal Circuit's opinion addressed these claims by Hearts Bluff against the Corps. The Federal Circuit dismissed the argument, concluding that "relying on representations by the Corps in purchasing the land in the hope that the government will grant a discretionary mitigation banking permit does not create a compensable property interest . . . . Such detrimental reliance . . . does not create a property right under takings law." *Id*.

Because the State's lack of regulatory authority—and the attendant attenuation of causation—resolve this case, we need not decide these issues.

## VI.  The State's Plea to the Jurisdiction

The jurisdictional question at the heart of this case is whether, considering Hearts Bluff's pleadings and the evidence submitted in the plea to the jurisdiction proceeding,  there are sufficient facts to support an inverse condemnation.  Construing the pleadings liberally in favor of the plaintiffs and considering the evidence submitted with the plea, we conclude that Hearts Bluff has not established the existence of jurisdiction in this case because Hearts Bluff cannot establish a viable takings claim.  *See Miranda,* 133 S.W.3d at 226 (citation omitted). Although the value of Hearts Bluff's property interests was likely diminished by the Corps' decision, Hearts Bluff does not challenge the proposition that the State lacked the authority to deny the federal permit required for a mitigation bank.

Hearts Bluff also asks this Court to remand the proceeding to allow additional discovery, a position the dissent endorses.  Because courts should determine whether they have jurisdiction as early as practicable, courts should allow "reasonable opportunity for targeted discovery" if necessary to illuminate jurisdictional facts in a plea to the jurisdiction.  *See id.* at 233. At the trial court, Hearts Bluff sought "thorough" discovery of its case, which the trial court properly denied but allowed limited discovery.  Hearts Bluff participated in discovery.  It was granted six depositions by order of the trial court, propounded requests for production to the State, and obtained documents from the Corps and internet websites maintained by defendants and from private engineering and environmental consulting firms.  However, the record does not show that Hearts Bluff took any of the depositions to which it was entitled, of the State or of the Corps (or anyone else), during the

thirteen months from its filing of the lawsuit to the date the trial court ruled on the plea to the jurisdiction. Hearts Bluff did, however, fail to answer the State's discovery for months until ordered to do so by the trial court. In addition, Hearts Bluff amended its original petition twice after filing suit, including the Second Amended Original Petition that it filed with its response to the State's motion to dismiss for lack of jurisdiction. *See Steele*, 603 S.W.2d at 788 ("We do not, however, in reversing the judgments below, place our decision upon the absence of an opportunity to amend because no point is presented which asks us to do so.").

The dissent contends that "at the State's insistence, there has been little discovery and no trial." __ S.W.3d __ (Hecht, J., dissenting). The record confirms that Hearts Bluff took discovery of the Corps, the State and others, that it did not avail itself of additional discovery to which it was entitled or which the trial court ordered it could take, and it did not file a motion to continue the hearing on the motion to dismiss to take additional discovery. We perceive no injustice to Hearts Bluff arising from its choice not to take advantage of greater opportunities to discover and present its case before the trial court granted the plea.

## VII. Conclusion

For the reasons explained, we affirm the decision of the court of appeals reversing the trial court's denial of the plea to the jurisdiction and hereby dismiss the action for lack of subject-matter jurisdiction.

_____
Dale Wainwright
Justice

- 35 -

OPINION DELIVERED: August 31, 2012